148 So. 12

## P. OLIVIER & SON, Inc., v. BOARD OF COM'RS OF LAKE CHARLES HARBOR AND TERMINAL DIST. et al.

No. 32125.

Jan. 3, 1933.

Rehearing Denied May 1, 1933.

Moss & Siess, of Lake Charles, and Manning W. Heard and William B. Grant, both of New Orleans, for appellant.

E. R. Kaufman and Pujo, Bell & Hardin, all of Lake Charles, for appellees.

McCoy, Moss & King, of Lake Charles, amicus curiæ.

ST. PAUL, Justice.

This is an appeal on a judgment rendered against the plaintiff, P. Olivier & Son, Inc., involving a breach of contract. The trial judge has set forth in detail the facts involved in the case, along with his reasons for judgment, which we annex as an appendix hereto.

The plaintiff a general contractor, upon submission of a lump-sum bid in competition with others, was given a contract by the board of commissioners of Lake Charles harbor and terminal district, properly acting through its board, to build a wharf and sheds, known as Wharf Unit No. 3, for the price and at the sum of $444,000; it being stipulated in the

contract that subcontractors, as such, would not be recognized.

Plaintiff, immediately upon execution of the contract proceeded with the performance of its obligations thereunder and let out subcontracts for materials and labor.

One of these subcontracts was for the furnishing of all the creosoted piling and lumber to be used in the unit, and was let to the American Creosote Works, and called for "treatment" according to the plans and specifications of the board.

These specifications provided the manner for treatment of the piling and lumber and set forth in detail, under the caption "Treating Operations," the process to be followed in its treatment by what is known and designated as the "Full Cell" process; they also provided, under the general caption "Inspection," in subcaption "Inspection of Piling," that:

*"Piling will be inspected by an Inspection Laboratory or authorized inspector under the employ and paid by the Dock Board. This inspection will be made before, during and after treatment at the creosoting plant."*

The Robert W. Hunt Company of Chicago was awarded the contract of inspection and placed its most experienced men at the plants of the American Creosote Works to supervise the treatment of the materials of its employer, the dock board, all in accord with the plans and specifications of the board, and with specific instructions of said board, acting through its representative Elmer E. Shutts, engineer, to mail all reports on material and treatment directly to said Elmer E. Shutts, engineer.

The piling and lumber, immediately after treatment, was shipped to the job site and the piling driven into position under the direction of the board's engineers.

After approximately 2,473 out of a possible 3,600 had already been driven, the operation of a dredge in a position nearby sucked some of the sand and silt from around the base of one of the piles, causing it to lean out of line.

It was not until then that, upon investigation by the engineers, the piling then driven were pulled in large quantities and the majority showed signs of brooming and disintegration, whereupon an investigation was made by the board's engineers to discover the cause of the failure.

Pile-driving work was interrupted and plaintiff, feeling confident that the fault, if any, was caused by some error in the specifications itself and not in the manner in which said specifications were followed, so advised the board, at the same time asking for time allowance and requesting arbitration to fix the responsibility of the failure, but without avail.

On September 24, 1931, the board notified plaintiff that by thorough examination and tests, it believed that a great majority of the piles driven by him were broken, crumbled, disintegrated, defective, and unsuitable, and must be and were rejected by the board until proved otherwise; and ordered him to make examinations and tests thereof by the pulling of all piles in every tenth bent for examination, with the understanding that all piles found to be defective should be removed and replaced at the expense of the contractor,

the pulling and redriving of all piles found to be sound and not defective to be at the expense of the district.

The plaintiff refused to do this, and on October 28th the board, through its engineer, rejected all creosoted piling, timber, and lumber which had been supplied by the contractor, declaring it unsound and unfit for use, and not in accordance with the contract, plans, and specifications; and ordering same removed from the site and replaced by sound and satisfactory materials.

Plaintiff took the position that it had complied fully with its contract and the plans and specifications; and requested the board to point out in what detail and particular the creosoted piling and lumber failed to comply with said contract, plans, and specifications; but this the board failed to do.

Plaintiff then made demand for payment under its schedule, and on failure to receive same, stopped work, and was put in default by formal resolution of the board on November 12 (10), 1931; the board thereafter taking over the work itself and this suit thereupon following.

## I.

The substantial issue involved is: Who is responsible for the failure of the piling?

The record discloses that all of the creosoted piling and lumber to be used on the dock board's job was to be furnished by the American Creosote Works under a contract between plaintiff (contractor) and the American Creosote Works, which provided that the material was to comply with the contract, plans, and specifications of the board.

That under the contract, plans, and specifications, piling should be inspected by an inspection laboratory or authorized inspector under the employ and paid by the dock board; this inspection to be made *before, during, and after treatment at the creosoting plant;* that creosoted timber and lumber were also to be inspected by the board's inspector at the treating plant; and that all inspection and analysis of creosoted oils would be made at the plant. (Specifications, p. 55.)

That in a written proposal for inspection of the piling and lumber to be used in the construction of the new docks submitted to the dock board by Robert W. Hunt Company, Consultants, Tests and Inspection Engineers, of Chicago, Ill., they offered to use at each plant two inspectors so that an inspector would be on hand at all times during night and day treatments; also to have its manager give the work his careful attention and supervision; gave the names and experience of the inspectors to be used and vouched for their ability, honesty, and integrity. (Trans. vol. 3, p. 622.)

That this proposal was favorably acted upon by the board, and on June 23, 1931, through Elmer E. Shutts, engineer of the said board (Trans. vol. 3, p. 628), notice of the award of the contract of inspection was sent to Robert W. Hunt Company at their New Orleans office. In this letter Shutts requested that their most experienced men be placed on this inspection and that they be kept continuously on duty while materials were being treated; expressing confidence in their ability to inspect the material and the long-standing confidence entertained for the company itself; requesting the making of all reports on

material and treatment to him (Shutts) personally; instructing them to notify the board immediately should any irregularities in treatment occur or should its representatives have any difficulties, so that they might offer assistance, and telling them to keep in mind that they were 100 per cent. back of them on the inspection of the material. Four sets of specifications and two sets of plans, complete in every detail, were inclosed with the following instructions: "We therefore think it important that you should have them and be familiar with them."

The record further discloses that in the course of treatment at the plant, some difficulty was encountered in getting some of the charges sufficiently dry, in accord with the specifications, to satisfy the board's inspectors; that the question of the use of compressed air was brought up by the treating plant and fully discussed with the inspectors in an effort to bring about the desired results; that the compressed air was thereafter applied on some of the charges with the knowledge and consent of the board's inspectors; that this air was applied, not on all charges, but only as best judgment might dictate; and that the charges, immediately upon being removed from the treating cylinders, were finally inspected and tested by the board's inspectors and either rejected or allowed to be shipped to the building site.

That a separate record of the treating operations at the plant was kept by the plant superintendent; that the plant's record showed the use of air, the amount thereof, and the time duration on each charge, while the record of the inspectors, in the form of per-

sonal notes (not included in the transcript), may or may not have showed this detail, nevertheless, this feature was not included in the inspector's reports to Shutts, so that Shutts claimed he was ignorant of the use of air until the trial of the suit.

The record also discloses that in addition to the "Treating Reports," "Certificates of Inspection" of the Robert W. Hunt Company, signed by their inspectors, were sent to Elmer E. Shutts, the engineer, certifying that every stick of creosoted piling and lumber described therein and consigned to the building site had been *inspected according to instructions, and, based on their experience and judgment, were within the limits of the specifications of the Lake Charles Harbor and terminal district, furnished by them.*

There is little or no doubt that the application of air on the material, at a time when it was at its weakest and not physically able to stand the pressure, i. e., after being subjected to steaming for several hours, punished it severely and caused it to eventually fail under the usual pounding of the hammer while being driven at the site.

From these facts gleaned from the record, we cannot help but place the blame for failure on the defendant board. They surely were well protected under their contract against the trouble encountered and had every facility and opportunity to know exactly what they were getting. Their expert treating engineers were at the plants, and, through the eyes and judgment of their inspectors, watched every detail of treatment—especially the use of air which they approved —tested and inspected the finished charges, rejecting those which did not suit them and

accepting or approving those which did, allowing those which were approved to be shipped to the site and, without further inspection, driven into position.

It certainly was the duty of the inspection laboratory to know what was or was not permitted under the specifications, details of which they were familiar with, and it certainly was their province to determine whether the process of treatment was or was not in accord with those specifications, and to reject or accept the charges according to the dictates of their own judgment. But the truth of the matter is that whilst the board looked for compliance with the specifications regarded in the light of Process Specifications, their inspectors required results, as though the treatment was under what is known as Result Specifications. The difference being that in Process Specifications, the different operations and their sequence are stated and little if any discretion left to the contractor, the owner accepting the responsibility for the results, whilst in Result Specifications what is wanted is stated, but directions are not given as to how to obtain that result.

But be that as it may, this whole matter would not have arisen had the inspectors rejected the material at the plant and not allowed it to be shipped; for surely Shutts, who admits that he was not a treating expert and had no facilities for testing the material at the site, could not himself inspect it; and the record shows that he made no attempt to do so, but apparently relied upon Hunt's certificate of approval and ordered the piles driven into place almost immediately after they arrived from the plant. And but for the accidental discovery of the defects he never would have known them to exist.

Whilst the learned trial judge points out, in his opinion, the fact that the contract provides for inspection when and where the engineer desires and for inspections and rejections even after materials are in place, we find that he fell into serious error on this point, since on page 55 of the Specifications, we read:

"Piling will be inspected by an Inspection Laboratory or authorized inspector under the employ and paid by the Dock Board. *This inspection will be made before, during and after treatment at the creosoting plant. Creosoted timber and lumber will also be inspected by the Board's inspector at the treating plant. * * *"*

And since it is a well-settled and well-established principle of law that special provisions in a contract must prevail over those of a general nature, it follows that under the provisions above quoted, inspection of creosoted piling and lumber was to be made at the creosoting plant and not elsewhere.

## II.

We have therefore come to the conclusion that the defendant is wholly responsible for the conditions brought about by the failure of its own inspectors to require that the specifications be followed as written regardless of results, if indeed, under the circumstances, not following the specifications did in fact result in the material received being inferior to that which they would have received had the specifications been followed to the letter. For it is clear that there is some room for doubt on that point, since the board's inspectors, who were admittedly experts in the

treatment of creosoted timber, as well as the experts who were doing the work for the creosote works, were of opinion that the literal following of the specifications as written was not bringing about the results which the board and its engineer expected, and all testify that the treatment under the specifications as prepared, even if standard and faultless, was not drying the green wood sufficiently to enable it to take the required amount of preservative.

Moreover, apart from that, we think the defendant is estopped in the premises. It provided in the contract that it should do its own inspecting through its own inspectors, and it proceeded to do just that. There is no question that the board would have rejected any material that its inspectors had rejected, and it would have been a mere idle gesture for plaintiff to have put other inspectors at the plant or elsewhere. For had plaintiff accepted materials which the board's inspectors had rejected, the board would not have allowed it to go into the work.

On the other hand, had plaintiff rejected materials which the board's inspectors had accepted, the result would have been that plaintiff would have had to pay for such materials anyhow because the creosoting works, who were furnishing the materials, might justly say that plaintiff had no right to reject materials which the board was willing to put into the work; that plaintiff's rejection of materials, accepted by the board's inspectors, was purely arbitrary and wholly unreasonable.

Again, the contract provided that plaintiff should receive no money from the board unless it had first paid for the materials which it purposed to use in the work or had made satisfactory arrangements for such payments, wherefore the plaintiff was obliged to pay or secure the creosote works and deliver the materials to the job before it could get its own pay from the board; and manifestly the creosote works would not have delivered materials to the job unless said materials had first been accepted by the board's inspectors. All of which makes it clear that despite all the verbiage of the contract and specifications, the only inspection ever contemplated by either party was the inspection which the board undertook to make and did in fact make for itself at the plant; that under such inspection, if favorable, plaintiff would incur an inescapable liability towards the creosote works; and that defendant could not thereafter repudiate the work of its inspectors to the prejudice of the plaintiff, and is estopped.

## III.

As a basis to work on, we have taken the figures of the three experts, formed into a committee to investigate the claims of plaintiff, and we set out below the damages properly due plaintiff, as follows, to wit:

| | | |
|---|---|---|
| Contract price | | $444,000.00 |
| Extra work ordered | | 68.04 |
| Total contract price and extras | | $444,068.04 |
| Costs to complete contract from date of notice of default (C. R. Sched. 3, pg. 31) | $205,759.43 | |
| Less reductions of costs (Sched. 3-H, pg. 41) | 4,561.18 | 201,198.25 |
| Total earned by contractor on contract | | $242,869.79 |
| Less payments by board: | | |
| On engineer's certificates | $ 56,810.63 | |
| To plaintiff's creditors on subcontracts | 42,323.31 | |
| Total payments by board | | $ 99,133.94 |
| Balance due plaintiff on work | | $143,735.85 |
| Extra expenses of plaintiff from cessation of work to Nov. 12, 1931 | | 9,864.61 |
| Amount for which defendant is liable | | $153,600.46 |

## Decree.

For the reasons assigned, the judgment of the lower court is set aside and reversed, and it is now order that there be judgment in favor of the plaintiff and against the defendant for the full sum of $153,600.46, with legal interest from November 12, 1931, until paid and all costs.

It is further ordered that the defendant be and it is hereby enjoined and restrained from paying out of the proceeds of the authorized bond issue any part thereof to the prejudice of this judgment.

OVERTON, Justice (dissenting).

In my opinion, defendant was not precluded from inspecting and rejecting, as defective, the piling in place, under the terms of the specifications, because its inspectors accepted the piling at the plant, and assented to the use of air to force the creosote to the required depth. Such timber as would not receive properly the creosote when it was applied, as required by the specifications, should have been replaced with other timber rather than depart from the specifications by the use of air. The assent of the inspectors to the use of air should not be treated as a waiver of defendant's right, under the specifications, to inspect the piling in place, and force upon it piling wholly unfit for use. The act of the inspectors, and such knowledge as defendant had of it, should be construed as sanctioned only in the event the piling stood the test of inspection in place.

## Appendix.

### Judgment of District Court.

The plaintiff, alleging that it had a contract with the Board of Commissioners of the Lake Charles Harbor and Terminal District, hereinafter called the "Dock Board," to furnish labor and materials for the construction of Wharf Unit No. 3, and Steel Sheds Nos. 4 and 5, which contract was breached by the Dock Board, after heavy obligations to material men, subcontractors and laborers had been incurred by the plaintiff, and after a considerable part of the construction had been completed, all in strict compliance with the terms of the contract, brought this suit against the Dock Board to recover the sum of $453,371.17, as damages, and for anticipated profits under the contract.

As breaches on the part of the Dock Board, the plaintiff alleges the failure of the defendant to make payments due as the work progressed; the action of the Dock Board in condemning all creosoted lumber on hand for use on the job; the order of the Dock Board directing the removal of all said material, whether in place or on hand; the resolution of the Dock Board, declaring the contract at an end; and the action of the Dock Board in itself undertaking the erection of the wharf and sheds.

The plaintiff further alleged that the Dock Board had in its possession the proceeds of the sale of a bond issue, which were dedicated to the payment of defendant's obligations under the contract mentioned; that under the law, the Dock Board did not then have, nor would it ever have any other funds with which to discharge its obligations under the contract; and there was a prayer for an injunction to prevent the Dock Board from spending $453,371.17 of the funds received from the bond issue.

The Dock Board denied any breach on its part, and alleged a failure of the plaintiff to comply with the specifications, resulting in latent defects in the material, causing the failure of a large part of the piling which was driven; that upon the accidental discovery of the latent defects in, and the absolute unsuitability of the creosoted material, it was ordered removed and replaced by the plaintiff; and upon plaintiff's refusal so to do, the defendant, itself, took over and began the construction of the wharf and sheds.

After a hearing, the Dock Board was temporarily enjoined from spending $250,000.00 of the money it had received from the sale of bonds issued to pay for the work undertaken by the plaintiff.

On the trial of the case on the merits, it was abundantly established that all of the creosoted material, especially the piling, was so disintegrated as to be unfit and hazardous to use. (Coleman, Tr. 722; Cummings, Tr. 751, 755). A total of 3589 piling was treated with creosote, accepted by the inspectors, and I presume shipped to the docks. Of this number, the plaintiff actually drove 2468, as part of the foundation of the wharf, sheds and railroads that ran over the water. (Shutts, Chart 2, Exhibit 13. At page 385 of the transcript, Shutts gives this number as 2473).

Pile No. 15 of Bent No. 34, which had been driven, fell over on August 20, 1931, was pulled for inspection, and more than half of it was found to be broomed and disintegrated. (See Photograph "D-17"). In order to see if other piles were defective, the Dock Board pulled a total of 96 piles, most of which were selected at random, by disinterested persons, from all of the piling driven, of which 70, or 77 per cent (Shutts, Charts 1 & 2) were found to be broomed. Miller, for plaintiff, gave the total number pulled as 93, and the number failed as 52, or 55.9 per cent. (Tr. 294). A "broomed" pile is one whose fibres have so disintegrated that all or part of it looks like the long fibres of a huge rope, or as a large, round broom would appear. The plaintiff was requested to select the piling to be pulled for testing, but refused to do so.

Each of these piles under the wharf was intended to support a normal load of 40,000 pounds, and at a time a load of 80,000 pounds (Shutts, Tr. 337). Piles in the water along the front of the wharf, were intended to support railroad tracks, over which were to run loaded freight trains, and no argument is necessary to show that it would have been unsafe to risk property and human lives on such piles as those just described (Coleman, Tr. 743).

No witness testified that the piles and creosoted lumber were safe to use, or suitable for the purpose for which they were intended, and I do not understand that plaintiff now so contends.

The plaintiff, however, urges that even if the material has failed, it complies strictly with the contract and specifications, in which event the responsibility for failure must rest upon the Dock Board.

Plaintiff's contention that material furnished in strict compliance with the specifications need be neither safe nor fit, is amply justified by paragraph 1, page 17, and (a),

paragraph 14, page 20, of the contract and specifications, which read in part as follows:

"These specifications * * * are intended to provide for a finished piece of work, * * * executed with materials and workmanship of first class quality, *or as specifically described.* * * *

"All materials used in the work, *which are not described specifically*, shall be the best quality that it is customary to employ in construction of the character involved. * * * " (Italics by the writer.)

The contract between the parties provides that the plaintiff shall furnish all materials and labor, and construct and deliver a completed job "in the manner and in strict accordance with the said plans and specifications," which are annexed to and make a part of the contract. (Contract attached to petition, page 10.)

It is further agreed that:

"The contractor shall under no circumstances have the right to increase, diminish, or alter the work to be done under the contract." (Contract, par. III, pp. 11, 12.)

"The materials shall be such as are required by the specifications * * *." (Contract, par. V, p. 12.)

The specifications for piles, after requiring that they be cut from live trees, provided in part as follows:

"(a) All material to be creosoted shall be steamed until in the safe judgment of the Board's Inspector, any moisture in the wood will not prevent the injection and proper distribution of the specified amount of preservative.

"(b) Piles may be steamed in the cylinder at not more than 30 lbs. pressure per square inch for not more than forty-eight hours at not more than 274 degrees F., which pressure and temperature maximum shall not be reached in less than two hours. The cylinder shall be provided with vents to relieve it of air, and insure proper circulation of steam. After steaming is completed a minimum vacuum of 22 inches shall be maintained for not less than 15 minutes. The cylinder shall be relieved continuously or frequently enough to prevent condensate from accumulating in sufficient quantity to reach wood. Before the preservative is introduced, the cylinder shall be drained of condensate.

"(c) Timbers may be steamed in the cylinder at not more than 30 lbs pressure per square inch for not more than 20 hours, at not more than 274 degrees F., which pressure and temperature maximum shall not be reached in less than two hours, except that in treating pieces with a least dimension under four (4) inches, the steam pressure shall not exceed 20 pounds per square inch. The cylinder shall be provided with vents to relieve it of air and insure proper circulation of steam. After steaming is completed a maximum vacuum of 22 inches shall be maintained for not less than 15 minutes.

"The cylinder shall be relieved continuously or frequently enough to prevent condensate from accumulating in sufficient quantity to reach the wood. Before the preservative is introduced the cylinder shall be drained of condensate." (Contract and Specifications, attached to petition, par. 19, p. 22.)

"The ranges of pressure, temperature, and time duration shall be controlled so as to re-

sult in maximum penetration by the quantity of preservative injected, which shall permeate all of the sapwood, and as much of the heartwood as practicable. The vacuum requirements stipulated are those at sea level, and necessary corrections shall be made for altitude." (Contract and Specifications attached to petition, par. 21, p. 22.)

"Penetration shall be determined by sampling material in each charge, as may be desired by the Board's inspector. Any holes which may be bored shall be filled with tight-fitting treated plugs." (Contract and Specifications attached to petition, par. 23, p. 23.)

"Treating of all material shall be by the full cell process, as follows:

"(a) The material shall be subjected to a vacuum of sufficient intensity to insure that the wood is as dry and free from air as is practicable, and to permit a retention of the specified number of pounds of preservative per cubic foot of wood.

"(b) The preservative shall be introduced between 165 degrees F. and 200 degrees F. and the cylinder filled without breaking the vacuum. The pressure shall then be raised to and maintained at a minimum of 100 lbs. per square inch or until the quantity of preservative required to insure the final retention stipulated is injected into the wood, or until the Board's inspector is satisfied that the largest volumetric injection that is practicable has been obtained. The temperature of the preservative during the pressure period shall be not less than 150 degrees F., nor more than 200 degrees F., and shall average at least 180 deg. F. After pressure is completed the cylinder shall be emptied speed-

ily of preservative and a vacuum of not less than 22 inches promptly created and maintained until the wood can be removed from the cylinder free of dripping preservative." (Contract and Specifications attached to petition, par. 27, p. 23.)

All of the creosoted piling and lumber for use on the Dock Board's job were treated and furnished by the American Creosote Works, from their plants at Southport near New Orleans, and Winnfield, under a contract between the plaintiff and the American Creosote Works, which provided that the materials were to comply with the contract and its specifications, made by the plaintiff and the Dock Board (Miller, Tr. 290).

Brazleman, the Vice-president of the American Creosote Works, testified for the defendant, that the Dock Board Specifications for treating creosote materials provided for the "full cell treatment" (Tr. 83) which he thus described:

"In full cell treatment at the completion of the seasoning treatment, a vacuum is drawn in the cylinder which extracts the air from the wood cells. While the vacuum is held the preservative is put into the cylinder. Consequently it is soaked into the wood almost immediately, and then pressure is applied to drive it in farther. When the required amount of preservative is reached the pressure is stopped, and the air is pumped back into the cylinder. In that case the cells are filled with oil, and consequently it is called a full cell treatment." (Tr. 86.)

There are two kinds of specifications, result specifications and process specifications. In the first mentioned what is wanted is stat-

ed, but directions are not given as to how to obtain the result. In the process specifications, the different operations and their sequence are stated, little if any discretion being left to the contractor, and the owner accepts the responsibility for the result. (Austin, Tr. 250; Von Schrenk, Tr. 640, 655, 656.)

Notwithstanding the facts that the Dock Board specifications do not provide for the use of compressed air; that they provide for the "full cell" treatment of the material, which method does not call for the use of compressed air; and the fact that the specifications are essentially process specifications, the American Creosote Works, which supplied all of the creosoted material, used compressed air at a pressure of 30 pounds or over, for the last two hours of the steaming period, on 36⅔ per cent. of the piling, and on about 33⅓ per cent. of the lumber, according to the treating records of the American Creosote Works.

The plaintiff strenuously contends, in opposition to the well established doctrine, expressio unius est exclusio alterius; that because the use of compressed air was not expressly excluded in the detailed specifications for the creosoted material, its use was permitted. The specifications do not prohibit boiling of the material, or the use of nitric acid in their treatment, but if plaintiff's rule of interpretation is applied, plaintiff would have the right to boil the timbers, or use nitric acid on them, or do both, if he so desired.

Where a contract, and the specifications in question are a part of the contract, is clear and unambiguous, as is the one under consideration, courts will make their own interpretation of it, without the aid of expert witnesses, but it is interesting to note that the great weight of expert opinion in this case agrees with the court in holding that the use of compressed air violated the specifications. The following experts so testified: Austin, civil engineer, assistant manager of the American Creosote Company, operating 19 treating plants all over the country, with 17 years experience in creosote treating (Tr. 517); Von Schrenk, a graduate of five of the leading scientific institutions of the world, a consulting engineer of the principal railroad systems of the United States, with over 30 years experience in the creosoting of timbers, in this and European countries, and an international authority on the subject of creosoted materials (Tr. 596, 655); and Coleman, a consulting engineer of wide experience in the south with creosoted piling (Tr. 725). As against the testimony of these experts, plaintiff offered the testimony of Shilstone, a creosote timber inspector (Tr. 806) and Cogley, a treating engineer of ten years experience with the American Creosote Works (Tr. 118, 143), who had never made such treatment before (Tr. 135).

Although Von Schrenk has 25 or 26 treating plants that report to him on creosote material, and has visited 50 or more treating plants in this country and in Europe, he never heard of this treatment (Tr. 627, 653, 654).

Weber, superintendent of the Colonial Creosoting Company, never heard of subjecting steamed material to air pressure (Tr. 449); nor had Ray, an inspector of creosote material for fifteen years, whose business is

inspecting creosote material for the public (Tr. 488). Cogley, plaintiff's witness, treating engineer for the American Creosote Works for 10 years, had never before heard of this kind of treatment (Tr. 118, 135). Another of plaintiff's witnesses, Miles, superintendent of the American Creosote Works plant at Southport, never knew of any other company using air pressure on steamed material (Tr. 156), although he had used it for about a year (Tr. 155). Shilstone was the only witness who had ever heard of the use of this method (Tr. 813).

When timber is steamed for a considerable time, as was the Dock Board material, it becomes so soft one can easily stick his finger into the wood (Austin, Tr. 530). It was while the material was in this condition that air pressure, up to 63 pounds, in addition to steam pressure of 30 pounds, was introduced into the treating cylinders (P–259, P–261, P–264). The average combined steam and air pressure used at this stage of the treatment of the piling was about 55 pounds. The weight of the expert opinion is to the effect that the subjecting of the softened wood to the air pressure injured it, and caused its failure (Von Schrenk, Tr. 631, 665, 679; Coleman, Tr. 726; Austin, Tr. 518; Cogley, Tr. 141).

When the experts examined the rejected material, after its failure, they were all struck with the fact that it contained a highly abnormal amount of moisture, or as one expert expressed it, the timber was "water saturated" (Sweetzer, Tr. 553; Brust, Tr. 575; Von Schrenk, Tr. 602, 603; Wilson, Tr. 218).

Up to the saturation point, the water content of wood largely determines its strength (Sweetzer, Tr. 563). In all of the samples of the rejected material examined by Von Schrenk, all but one contained moisture very much above the saturation point. (Tr. 652).

Applying air pressure, at practically normal temperature, into a steam heater cylinder of high temperature, would produce some condensation (Von Schrenk, Tr. 657; Austin, Tr. 524; Koehler, Tr. 784), and force water into the wood cells (Von Schrenk, Tr. 657). Koehler, for the plaintiff, "thought" that the water forced into the wood cells would come out when the pressure was relieved (Tr. 876).

In addition to weakening the wood by driving a large amount of water into it, the wood was weakened in its already softened condition, by the crushing effect of the air pressure, caused by the fact that no air penetrated the heartwood, while the sap wood around it was easily penetrated (Austin, Tr. 531, 536; Von Schrenk, Tr. 631, 626, 627).

Wilson, Senior Engineer of the Forestry Products Laboratory, who admitted he was not an expert in the creosote treatment of wood (Tr. 253), with no experience in observation of treating plants (Tr. 215), no experience in using creosoted material (Tr. 214), and had never even seen a pile driven (Tr. 233), said he "had no reason" to believe that the air pressure caused any damage (Tr. 249), and "would not expect" any additional damage from air pressure over and above that resulting from the continued steam pressure (Tr. 256), but was not sure of this (Tr. 257). This a plaintiff's witness, who testified that the failed piling of the Dock Board failed be-

cause of compression stresses (driving stresses) just as had a failed piling he saw at the Toulouse Street Wharf in New Orleans (Tr. 207). Strange to say, however, this expert who with his superior knowledge, was supposed to aid the Court to render justice, left out of his testimony, and out of his written report on the subject, the fact which was brought out on cross-examination, that the Toulouse Street Wharf piling failed because it was driven through a concrete sidewalk (Tr. 211, 212). Koehler, a wood technologist, but not an expert in treating piles (Tr. 791, 792), seemed to be of the opinion that the air pressure caused no damage, "unless there was a severe drying in the air" (Tr. 286). Brazelman thought there would be no damage from the air pressure alone (Tr. 98), but what his opinion would be in regard to air pressure taken in connection with the weakened condition of the wood, and a steam pressure of 30 pounds, is not given. Levy, a wood chemist, with no experience in treating piles, was of the opinion that air pressure had no damaging effect on steamed wood (Tr. 795), and in this opinion Shilstone concurred (Tr. 809, 810).

The expert opinion of defendant's witnesses, to the effect that using air pressure on softened wood piling damaged them and caused their failure, is corroborated by the facts that the Dock Board's exact specifications are recognized by the engineering profession as standard (Von Schrenk, Tr. 636, 638, 646; Weber, Tr. 443; Tilley, Tr. 464; Ray, Tr. 484; Austin, Tr. 516; Coleman, Tr. 732; Cummings, Tr. 747); that piling treated under the identical specifications have given absolute satisfaction all over the country (Von Schrenk, Tr. 644; Coleman, Tr. 726; Cummings, Tr. 747); that no case of a similar failure has ever been seen by anybody (Coleman, Tr. 724; Cummings, Tr. 748); and by the fact that the first time piling were treated under these same specifications, with the addition of compressed air during the steaming period, there was a wholesale failure.

The exact specifications used by the Dock Board for Wharf No. 3 were used in its Units Nos. 1 and 2 (Shutts, Tr. 214). Material for Unit No. 1 was treated under these specifications. (Austin, Tr. 519), and material for Unit No. 2 was steamed for 12 hours at 30 pounds, just as was the rejected material in this case (Ray, Tr. 481). The Dock Board's specifications are exact copies of those used in the New Orleans docks (Shutts, Tr. 214), where they have been in use since 1904 (Coleman, Tr. 724). These exact specifications are also in use in Corpus Christi, Houston, Beaumont, Charleston (Coleman, Tr. 724, 725), Mobile, Port Arthur, Brownsville (Cummings, Tr. 745), and at a great many other ports (Austin, Tr. 516; Von Schrenk, Tr. 636, 638; Coleman, Tr. 724, 725; Cummings, Tr. 745).

The Dock Board specifications are word for word the same as those of the American Wood Preservers Association, with the single exception that the former allows a steaming period of 40 hours, while the latter permits steaming for only 24 hours. (Von Schrenk, Tr. 637). The Federal Specifications Board, which prescribes specifications for piling for the United States Government, has adopted word for word, the American Wood Preservers Association's specifications (Von Schrenk, Tr. 638). It is important to note that in no case was the material in this

case which failed, steamed over 24 hours, hence this material was treated exactly in accordance with the specifications of the American Wood Preservers Association and the Federal Specifications Board.

There is no word in the record denying the statements of defendant's witnesses that the exact specifications including steaming, time and pressure, have been in use for thirty years, that they are used in the ports mentioned; that they have resulted in proper piling; and that there is no record of any failure. ·

The fact that many specifications, including some prepared by Von Schrenk, which are being used at the present time, provide for a shorter steaming period and a lighter pressure, in nowise lessens the fact that the Dock Board specifications are standard, in general use, and produce excellent results, without a single record of failure.

Plaintiff's witnesses could not agree on the cause of the failure of the creosote material. Brazelman thought the cause was the driving of the piles too soon after cutting (Tr. 96). This witness, while much experienced in treating piles, makes no mention of any other experience or observation of the use of freshly cut and treated piles, and he gives no reason for his opinion. Koehler, who did not claim to be an expert on treating timber, could only explain the failure of the undriven pile on the ground that it was subjected to too high temperature (Tr. 790), although he said he expected no change in the structure of wood steamed from 25 to 30 pounds, as was the rejected material (Tr. 283). Wilson at first said the piling was weakened by the application of heat (Tr. 202). He then said the failure was due to the piles being freshly cut, immediately treated and driven (Tr. 207). The testimony of this witness has already been criticized. Notwithstanding the fact that Shilstone had testified that the use of 30 pounds of steam and 50 pounds of air did not hurt the timber (Tr. 809), he expressed the opinion that a steaming might have had something to do with the failure (Tr. 817, 818), although the average steam pressure was about 30 pounds. It seems that this witness urged as the principal ground for failure of the piles that the trees that year contained an unusual amount of moisture, which conclusion he reached from observing his orange orchard (Tr. 814, 815). Mutersbaugh was of the opinion that the piles were driven too soon after treatment, and because engineers do not give proper consideration to the effect on piling of the use of a Vulcan steam hammer (Tr. 838).

It is common and good engineering practice to drive green cut piling immediately as it comes from the treating cylinders (Coleman, Tr. 731; Brazelman, Tr. 99; Von Schrenk, Tr. 644, 645), and Von Schrenk has never known a failure (Tr. 644, 645). This testimony comes from two engineers of high rank, and from plaintiff's own treating expert, and is not denied by anybody. Since it is based upon practical experience, it must prevail over that based on mere theoretical opinion, given without reason to support it.

Plaintiff seriously contends, without any testimony to support the contention, that the piles failed for the additional reason that they were driven too hard. Plaintiff's contention is apparently based on the fact that of the

total 2473 piles driven, 110 were hammered more than 60 blows to the last foot, which is allowed under the Dock Board specification (Shutts, Tr. 385). Cummings watched many of the piles driven, and saw nothing unusual about the driving (Tr. 750). The driving records show no cause for failure (Coleman, Tr. 741). The average number of hammer blows for the last foot of driving is 21, much less than the 60 which is standard for driving (Shutts, Tr. 382). Some of the American Creosote Works piling which was driven, and immediately pulled for testing, failed at 16 blows per last foot. Numerous of the failed and disintegrated piling received ten to twelve blows per last foot (Shutts, Tr. 386). Thirty-four of the 70 failed piling received 25 or fewer blows per last foot, when the safe limit was 60 and over. This fact clearly establishes that the piling was not excessively driven. The great probability is that the brooming of the piles offered such increased resistance as to necessitate more blows per foot on them (Tilley, Tr. 471). I do not understand that Mutersbaugh expressed any definite opinion to the effect that over driving caused a failure of the piles (Tr. 838). Plaintiff is in error in urging that the hammer was allowed to fall an excessive distance on the failed piling, or that a different drop was used on them from that used on those now being driven (Shutts, Tr. 316, 866; Gessner, Tr. 867). The driving equipment used was standard (Cummings, Tr. 749; Shutts, Tr. 316).

Plaintiff urges that since 77 per cent of the 96 piles pulled were failures, the use of air pressure could not have caused that high percentage of failures, as only 36⅔ per cent of the piling received air treatment. This sort of contention would have weight if all of the piling driven were pulled, and 77 per cent of all the piles were found defective. No one can tell what percentage of failures another 96 of the piles would show, if pulled. Because one selects at random a card from a whole deck, and draws an ace, does not mean that he will draw an ace on each of the next three draws. The law of probabilities does not work that way.

Paragraph 18, page 22, and paragraph 1, page 55, of the contract and specifications provide that an inspection of lumber and piling shall be made "before, during and after treatment at the treating plant," by inspectors employed by and paid by the Dock Board. Based on these provisions of the contract, plaintiff urges that even if the creosoted material is defective, because not treated in accordance with the contract and specifications, the inspection and approval of the Dock Board's inspectors at the treating plant are final and conclusive, because only one inspection is permitted under the contract.

It is quite plain that the inspection at the treating plant was for patent defects, and to insure a proper degree of penetration for the preservatives in the piling. No strength tests for piling were contemplated, there were no facilities at the treating plants for such tests, and in fact none were there made. This inspection was evidently intended to minimize rejections on subsequent inspections, especially provided for after the material was in place.

An examination of the contract, extracts from which are quoted below, show that the contract provides for inspections when and where the engineer desires; that in two dif-

ferent parts of the contract, inspections and rejections after materials are in place, are provided for; that in another different part of the contract, an inspection is especially provided for after final completion of the work; that in three other paragraphs of the contract the plaintiff agrees to deliver a completed wharf for "final acceptance," which necessarily implies an inspection at the time; and in still another part of the contract the plaintiff agrees to "complete and deliver" the wharf "to the entire satisfaction of" the defendant, which also implies an inspection after the completion of the work:

"* * * Inspection shall be made by the Engineer or his representatives at such times and places as he may determine, and the contractor agrees to furnish all reasonable conveniences for such *inspections*, at his own cost." (Par. V, p. 12 of the Contract.) (Italics by the writer.)

"All work shall be subject to the approval of the Engineer, who shall have the right to condemn any part that is not strictly in compliance with the letter and spirit of the specifications, plans and contract; he shall also have the right to order the removal of any material which in his judgment is not proper to be used in the work. Immediately upon the rejection by the Engineer of any material or work, the Contractor shall remove from the site all condemned material which was furnished by him *and shall proceed to take down the work rejected, and, at his own expense shall replace them with materials and workmanship of the quality and character called for in the specifications*." (Par. IV, p. 12 of the Contract.) (Italics by the writer.)

Paragraph XVI, page 14, of the contract, provides in part that if the contractor "refuses or neglects to forthwith take down, rebuild, repair, alter or amend any defective or unsatisfactory work," the Dock Board has the right to take the work out of the contractors hands, and itself proceed with the work.

"After the final completion of the work, the Engineers shall with all due diligence proceed to measure and *inspect* the work and material furnished by the contractor under the contract * * *." (Par. XVII, p. 15.) (Italics by the writer.)

"Final payment will be made upon the completion and *acceptance* of the entire work under this contract * * *." (Par. 11, p. 19.) (Italics by the writer.)

"The issuance of any certificate by the Engineer or the payment of any moneys to the Contractor, whether due under the contract or not, shall not be considered or construed as an acceptance by the Board of the work either as a whole or in part, and the said work shall remain at the sole risk of the contractor until it is *finally completed and accepted in its entirety*." (Par. XI, p. 13.) (Italics by the writer.)

"The contractor hereby assumes all risks of whatever nature, from accidents, casualties or fortuitous events of every kind which may occur *before the completion and final acceptance of the* work." (Par. XVI, p. 13.) (Italics by the writer.)

"* * * The contractor and his surety hereby agree and bring themselves severally and in solido, * * * to furnish all materials * * * and labor necessary to complete and deliver * * * to the entire sat-

isfaction of the Engineer of the said Dock Board" (Wharf Unit No. 3, par. 1, p. 10).

Since the provisions of the contract and specifications just quoted plainly provide for an inspection, and rejection and acceptance of the work and materials in place in the structure, it is only necessary to determine what materials these provisions refer to. They can only refer to materials for which an inspection at a place other than the site is provided, for the specifications provide for inspection at some point other than the wharf and sheds of every important item that goes into them; creosoted timber and material (par. 18, p. 22), roof material (par. 2, p. 55), decking (par. 3, p. 55), structural and reinforcing steel and paint (par. 4, p. 55), and cement (par. 5, p. 55). If all important materials for which inspections are provided at a place other than the site of construction, be excluded from the provisions of the contract providing for inspection, acceptance or rejection after the materials are in place, then those provisions would mean nothing, and to so hold would read them out of the contract. This, of course, the Court cannot do, and it must be held that the defendant had the right, after the piling were in place, to inspect and reject them for latent defects affecting their strength, notwithstanding a preliminary inspection at the treating plant.

The plaintiff contends that it relied upon the inspection and acceptance of creosoted materials by defendant's inspectors at the treating plants, and on the strength of such acceptance, expended large sums of money to the suppliers of creosoted material, for freight, labor, etc., by reason of all of which defendant is now estopped from denying its acceptance at the treating plants is final. A sufficient answer to this contention is that one is never estopped by doing something, even if relied upon by the other contracting party, to the latter's disadvantage, if the contract specifically gives him the right to do the thing complained of. Moreover, there is no evidence in the record from any witness, to show that the plaintiff relied on the inspection complained of. One urging estoppel must prove all its elements. The Court cannot presume they exist.

The plaintiff's obligation under the contract was to "build by a plot," to deliver complete to the Dock Board Wharf Unit No. 3, built in the manner and of materials specified in the contract and specifications, within the terms of Civil Code 2756, reading:

"To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price."

It is believed this fairly appears from the provisions of the contract and specifications quoted above, under the discussion of inspection, and from the following additional extract of the specifications:

"These specifications * * * are intended to describe and provide for a finished piece of work, complete in every detail * * *" (par. 1, p. 17 of the Contract).

Not only does the contract, in plain terms, as well as by necessary implications, provide for a "finished piece of work, complete in every detail," but the contract in plain language negatives any intention that the work be accepted piecemeal, when it provides that:

"The issuance of any certificate by the Engineer or the payment of any moneys to the

Contractor, whether due under the contract or not, *shall not be considered* or construed as *an acceptance* by the Board *of the work either in whole or in part*" (par. XI, p. 13, of the Contract). (Italics by the writer.)

Under this plain language, there would have been no acceptance of the piling had they been paid for when inspected.

If plaintiff's obligation was to deliver a completed structure rather than to deliver materials from time to time, it necessarily follows that defendant had the right to inspect the materials in place, before acceptance.

The authorities cited by counsel for plaintiff have been carefully examined, and no case based on a contract such as is here involved was found.

The Dock Board calls attention to the fact that the treating records of the creosoted material show active violation of the specifications in several particulars, but in view of the Court's holding that the introduction of compressed air on the steamed material, violated the specifications, which violation rendered the materials unfit, it will not be necessary to consider other violations.

In this case the plaintiff has sued for damages for breach of contract, but as the Court has found that the plaintiff itself breached the contract, by putting into the most important part of the work unsafe and faulty materials, that did not comply with the specifications, and did not remove and replace them when directed by the Dock Board, as it was required to do by the contract, the plaintiff cannot recover.

The plaintiff neither directly nor indirectly caused the defect in the piling, purchased and drove the piling in good faith, did not seek to nor would it have profited by the use of defective piling, which the American Creosote Works furnished under an agreement that the piling would comply with the contract and specifications.

However, the plaintiff agrees with the Dock Board that under their contract, no materialmen or sub-contractor would be known or recognized, the sole responsibility being that of the plaintiff. Perhaps the plaintiff could have protected itself against such contingency as has here arisen. At any rate, this was one of the risks it assumed in entering the contract which, as to the parties thereto, has the effect of law. As held by our Supreme Court:

" 'Agreements legally entered into have the effect of laws on those who have formed them. * * * They must be performed with good faith.' R. C. C. art. 1901.

"Hence it follows that a party is obliged to perform a contract entered into by him if performance be possible at all, and regardless of any difficulty he might experience in performing it. * * *

"And the difficulty one may have in performing a contract is simply no excuse whatever for not performing it." Picard Construction Co. v. Board of Commissioners of Caddo Levee District, 161 La. 1002, 1007, 109 So. 816, 818.

The Dock Board has asked that its rights under the contract be reserved against the plaintiff and its surety on the bond, the Union Indemnity Company, owing to the impossibility of fixing the amount of the liability of either the principal or the surety at the time of the trial of this case. It was, in fact,

impossible to fix such responsibility at that time.

For the foregoing reasons, the law and the evidence being in favor thereof:

It is ordered, adjudged and decreed that the plaintiff's claim against all the defendants be and the same are hereby rejected.

It is further ordered, adjudged and decreed that the temporary injunction issued herein is hereby recalled and set aside.

It is further ordered, adjudged and decreed that the Dock Board's right against the plaintiff and its surety, arising out of the contract in question and bond, as well as from the issuance of the temporary injunction, be and the same are hereby reserved to the Dock Board.

It is further ordered, adjudged and decreed that the plaintiff pay all the costs of this suit, including the fees of the three experts, which are approved and taxed as costs.

Judgment read, rendered and signed in open court, at Lake Charles, Louisiana, on this August 6, 1932.