(57 South. 369.)

No. 18,853.

A. M. BLODGETT CONST. CO. v. CHENEY LUMBER CO., Limited.

(Jan. 2, 1912.)

*(Syllabus by the Court.)*

1. CONTRACTS (§ 295*)—PERFORMANCE—SUFFICIENCY.

Where a contract for the construction of a dam is silent as to whether the wing walls shall be straight or perpendicular or at an angle, and it is shown that both kinds are in use, though the construction at an angle is preferable, the contractor does not breach his contract by furnishing perpendicular walls.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1353; Dec. Dig. § 295.*]

2. CONTRACTS (§ 305*)—EQUITABLE ESTOPPEL—GROUNDS—PERFORMANCE OF CONTRACT.

When the owner stands by without objection, and sees the contractor constructing perpendicular walls and accepts the work after completion, he will not be heard several months afterwards, and after the walls have been in use, to say that the construction of perpendicular walls is not a fulfillment of the contract by the builder.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1467–1475; Dec. Dig. § 305.*]

3. CONTRACTS (§ 322*)—ACTIONS FOR BREACH—BURDEN OF PROOF.

Since the defendant seeks to escape from the obligation of his contract by alleging that the work sued for was defective, he must prove his allegation, and the proof does not sustain his contention, for it is most unlikely that a small quantity of water passing beneath the gate, due to the absence of grooves, which plaintiff should have furnished, caused the destruction of the whole work.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1615–1639; Dec. Dig. § 322.*]

4. CONTRACTS (§ 312*)—PERFORMANCE—SUFFICIENCY.

The evidence tends to prove that the destruction of the dam was due to an insufficient foundation, owing to the nature of the soil where the dam was located, and, as this place was chosen by both parties, the defendant cannot now hold the plaintiff responsible for the selection of this site.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 312.*]

5. DAMAGES (§ 19*)—ELEMENTS—PROXIMATE CAUSE OF INJURY.

Where a foundation gives way because of the nature of the soil beneath, and causes the walls and works above to fall, the proximate cause of the damage must be held to be the nature of the soil beneath the foundation, and not the construction of the work above.

[Ed. Note.—For other cases, see Damages, Dec. Dig. § 19.*]

Appeal from Sixth District Court, Parish of Ouachita; J. P. Madison, Judge.

Action by the A. M. Blodgett Construction Company against the Cheney Lumber Company, Limited. From a judgment for plaintiff, defendant appeals. Affirmed.

Clarke & Sholars, for appellant. Stubbs, Russell & Theus, for appellee.

BREAUX, C. J. This is an action brought to recover the sum of $2,983.34, less credits aggregating the sum stated in the petition and a credit of a small amount allowed by the judge of the district court as the price for constructing a concrete dam by plaintiff on defendant's land, according to contract.

Plaintiff, according to the terms of this contract, bound itself to furnish the contractor all labor and material except cement, gravel, and timber and filling, which defendant promised to furnish, the dam, including wing walls, to measure 189 feet long, 14 feet high, 10 feet wide at the bottom, and 3 at the top as per sketch.

The contract contains stipulations about gates for the concrete, also about the filling, spiking, a spilling 60 feet wide, 7 feet high. Specifications are given for devices for raising and lowering gates by means of lever racks and poll which plaintiff was to furnish. Plaintiff claims to have completed the work according to contract.

The defendant denies that plaintiff constructed the works in a complete workmanlike manner; states that the walls before mentioned were to have been built at a decided angle to the dam and floodgates according to plans and specifications by constructing straight instead of walls at an angle. The pressure on the walls was greater than it should have been, and thereby endangered the whole barrier across the stream on defendant's land known as the "Chevriere" stream; that the purpose in having the dam constructed was to regulate and control the stage waters of defendant's cypress brake, containing about 4,000 acres of land, which is above a watershed just above its lumber manufacturing plant, and, while controlling those waters, allow sufficient to flow also to maintain its reservoir on the south side of the dam; that the floodgates did not answer the purpose. They could not be easily handled. They were too heavy. Defendant complained of certain tie beams.

The defense sets up a number of grounds in support of the complaint that the contract had not been completed according to plans and specifications.

Plaintiff's suit was filed in May, 1909. After issues joined, the cause was heard, and a number of witnesses were examined. The court was about to decide when an agreement was entered into by counsel to reopen the case for the introduction of further testimony.

First. Whether or not there was a groove in the concrete base for the floodgates of the dam.

Second. Whether or not the polls, racks, and pinions (comprising the raising and lowering device) were installed on the gates in accordance with the contract, and, if not, the cost of installing same.

A short time thereafter the dam was washed away and destroyed, and thereupon the defendant filed an appearance in which it represented that the dam had broken, and had become entirely useless; that seven of the floodgates were wrenched loose and entirely destroyed; and that the remaining three were useless.

With the court's leave, an amended answer was thereafter filed, trial of the case resumed and other evidence was heard.

The court decided in favor of plaintiff, save as to one or two small items.

The defendant appealed.

The result is that there is evidence before and after the destruction of the dam, and the conflict in the testimony of the witnesses is as great after the destruction as it was before. The contradiction is irreconcilable, as is nearly always true when expert testimony is heard to prove the facts at issue.

[1] The want of angles in the walls gives rise to the first proposition for discussion. These side walls are of some importance, and are even indispensable. They were unquestionably straight. Had they been at an angle, they would have been more efficient in resisting the weight of the water that rested against the dam and these walls. The waters flowing against a direct wall come in contact with it in a perpendicular line, while in an oblique line the impact is less pronounced. The testimony does not absolutely condemn straight walls as adjuncts to a dam, although a decided preference is expressed for the wing walls at an angle.

This might be a far more serious objection were it not that the contract is silent in regard to the wing walls as to whether they were to be straight or at an angle. The

sketch which is referred to in the contract shows that straight lines were to be followed in constructing these walls.

[2] The representative of the defendant saw the wing walls while they were in the process of construction, and did not offer the least objection. After the completion of the work, he accepted it, and it was in use some time before fault was urged.

Finally, it was not at all proven that the ruin of the work was due to the defectiveness in these walls. The break, as we infer from the testimony, began at or near the center, and not on either of the sides.

[3] The groove in which the gates of the dam were to be set was not made on the flooring on which these gates were to rest, but the gates rested on the concrete foundation. The objection of defendant is that it was not water-tight as it should have been had the groove not been omitted.

They were provided for in the contract, and doubtless should have been made. The testimony does not sustain the view that the absence of these grooves was such a defect as to warrant us in decreeing that the whole work was worthless. It is not likely that a small quantity of water running at the bottom of a heavy weighted gate on a smooth concrete surface will cause a whole dam to break. That is the weight of the testimony on the subject, with which we find no difficulty in agreeing.

Mr. Parker, a civil engineer employed by plaintiff, testified (and in this he does not seem to meet with reasonable contradiction) that:

"The groove was not shown on the original sketch, but in making a more complete plan it was shown, as it would to some extent increase the water tightness."

The weight of the testimony does not show that it endangered the whole or any part of the work.

[4] The soil foundation on which the dam rested was not sufficiently firm. This is another point of difference between plaintiff and defendant. The contention on the part of the latter is that the faulty foundation was the cause of the dam giving way.

The following is part of an entry appearing in the transcript:

"Defendant formally abandons the allegation that the concrete foundation was not built or constructed to the depth required or provided for in the contract, plans, and specifications."

This does away with the objection to the foundation to the extent specially stated, and leaves plaintiff with little to complain about the concrete foundation.

[5] If the dam gave way because of the action of the water below the concrete, there is evidence—and that of a witness of plaintiff—that the wreckage and destruction of this foundation was due to the "utter insufficiency of the soil foundation, on which the works rested; and, second, the failure of the Blodgett Company to construct the works according to contract."

If the foundation was unsafe, if it was quicksand or blue mud, kind of soapstone, selected by all parties concerned, the works as performed by the Blodgett Company do not appear to have been the cause. The bottom having given way, the top had to fall, and the fall cannot, in the presence of the testimony, be charged to those who constructed the top under the facts and circumstances.

The manager of the defendant was present at times during the construction of the work. On one occasion, although at first objecting, he said that he was satisfied and gave approval to what had been done.

Judgment affirmed.