132 So.2d 700 (1961)
JUSTISS-MEARS OIL COMPANY, Inc.
v.
C. B. PENNINGTON.
No. 5351.
Court of Appeal of Louisiana, First Circuit.
June 30, 1961.
Rehearing Denied September 25, 1961.
Certiorari Denied November 6, 1961.
*701 Roland Kizer of Kizer, Heaton, Craig & Cangelosi, Fred G. Benton, Sr., of Benton & Moseley, Baton Rouge, for appellant.
L. W. Richey of Gaharan & Richey, Jena, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
LANDRY, Judge.
Plaintiff herein, Justiss-Mears Oil Company, Inc., an oil well drilling contractor, instituted this action against defendant, C. B. Pennington, to recover the balance of $32,850.12 allegedly due by defendant on a written contract pursuant to which plaintiff undertook to drill a "wildcat" oil well in consideration of defendant's agreement to pay the sum of $35,500 for said service.
For written reasons assigned, the learned trial court rendered judgment in favor of plaintiff contractor in the sum of $32,850.12, with legal interest thereon from September 6, 1957, until paid, and all costs. The amount of the judgment rendered below represents the contract price less a credit due defendant owner in the sum of $2,649.88 conceded by plaintiff to be owing for a Schlumberger test charged to defendant but admittedly owed by plaintiff. From the adverse judgment below, defendant has taken this appeal. Plaintiff has answered the appeal praying for damages for a frivolous appeal.
Plaintiff's petition alleged that pursuant to an instrument dated August 13, 1957, plaintiff and defendant entered into a drilling contract (a copy of which is annexed to and made part of plaintiff's petition) wherein plaintiff agreed to drill an oil well to be known as No. One Howell well, located in Section 60, Township 2 South, Range 1 West, East Feliciana Parish, for the agreed price of $35,500. The petition further relates that drilling operations were actually commenced August 9, 1957, and completed in accordance with the contract and to the contract depth on September 3, 1957. Finally, it is asserted defendant refused to pay the contract price despite plaintiff's performance of all requirements of the agreement.
Defendant answered admitting execution of the contract and defended his declination to pay the agreed price on the ground the well was not completed as agreed. The pertinent articles of defendant's answer read as follows:

"4.
"For answer to paragraph 4 of plaintiff's petition defendant admits that petitioner commenced drilling operations on August 9, 1957, but defendant denies that petitioner completed the well in accordance with the contract or to the contract depth.

*702 "5.
"For answer to paragraph 5 of plaintiff's petition defendant denies that petitioner performed all of the obligations required of it by the contract, and alleges that for this reason defendant has refused to pay the agreed contract price.

"6.
"Further answering said petition defendant shows that plaintiff violated the provisions of the drilling contract in the particulars which will be shown upon the trial of this case, and for this reason defendant has refused to make the payment demanded of him, and with respect to which defendant reserves his right to hereafter claim damages in an appropriate proceeding."
The material facts and circumstances generating this lawsuit are not in serious dispute between the contending litigants.
In the early months of 1957, defendant, a lease broker and oil speculator, obtained mineral leases on several thousand acres of land situated in East Feliciana Parish, a principal consideration for which was his unconditional obligation to commence, before August 10, 1957, operations for the drilling of a test well to a depth of 9,000 feet. About the first of August, 1957, defendant employed plaintiff to drill the well defendant had obligated himself to bore, the agreement between said parties being reduced to writing on a more or less standard printed drilling contract form in general use in the oil industry. The contract provides that the well shall be drilled to a depth of 9,000 feet and would be a "slim hole test" which, to those experienced in the trade, simply means the hole was to be smaller than the usual or ordinary hole sunk in the search for oil and therefore somewhat less expensive than a well of customary bore.
The entire disagreement between plaintiff and defendant arises from the following provisions appearing in the contract:
"10. Drilling Methods and Practices:

* * * * * *
"10.6 Contractor agrees to drill the well in such a manner that its deviation from vertical shall at no time exceed the deviation limits specified in Par. 3 of Exhibit `A', and shall make vertical deviation surveys without cost to Owner at least once every five hundred (500) feet with standard instruments and equipment acceptable to Owner. When the hole is found to be more than the permissible degrees off vertical, Contractor, if requested by Owner, shall cement off and redrill or otherwise straighten the hole to the satisfaction of Owner. Owner reserves the right to survey the hole with his own equipment at any time and at any depth during the course of the drilling operations, but the time required for such surveys shall be paid for at the applicable day work rate. Cementing off and redrilling or straightening any hole drilled on footage basis with more than permitted deviation shall be at the Contractor's expense. The time required to cement off and redrill or straighten any hole drilled on day work basis shall be paid for by the Owner at the applicable day work rate.
"11. Completion Tests and Installation of Well Connections:
"11.1 Contractor agrees, when making a completion test of the well, to run tubing and to swab the well at the request of Owner, with swabbing equipment furnished by Owner, for a length of time sufficient to make certain that the hole is free of drilling mud or water or both. Regardless of depth, Contractor, at applicable day work rate, shall continue the work of swabbing or hold Contractor's rig while pumping or flowing tests are being made, for such length of time as Owner may deem it necessary for completion of the well in accordance with his wishes; or, if *703 requested by Owner to do so, Contractor shall plug and abandon the well, at the applicable day work rate.
* * * * * *
"14. Reports to Be Furnished by Contractor:
"14.1 Contractor shall keep and furnish to Owner a daily drilling report on forms provided by Owner or in the manner designated by Owner. This report shall be open to inspection by Owner at all times.
* * * * * *
"14.3 Contractor shall keep an accurate log of the well, giving depth and thickness of each formation from the surface of the ground to the bottom of the hole, and will attach one typed copy of the well log to the final bill when it is presented to Owner for payment."
During the course of drilling the well and when a depth of approximately 4,300 feet was reached, an unfortunate and tragic accident occurred on the rig as a result of which defendant's son, who was checking the well as defendant's agent, representative and business associate, was fatally injured. Plaintiff thereupon requested defendant to advise whether defendant desired to abandon the well or complete the hole and was directed by defendant to proceed to contract depth. The well was then completed without further incident. During the drilling process defendant employed an independent mud logging crew to analyze mud samples as the well was being drilled from depths of approximately 4,000 feet to hole bottom at 9,000 feet. In addition to keeping the mud logging crew at the well site for the last 5,000 feet of drilling it also appears that during the drilling process defendant dispatched a petroleum engineer to the well on at least two occasions. When the well was completed plaintiff notified defendant contract depth had been attained and defendant immediately dispatched a petroleum engineer, Blackwell, and a Geologist, Kilbourne, to examine and test the well to determine whether or not it was a producer. Defendant's geologist and engineer spent over 12 hours on the well site conducting all usual and customary tests and examinations ordinarily taken in evaluation of a well after completion. An electric log showing the depth of the well, (but admittedly not the degree of deviation) as well as the formations penetrated, was run by a sub-contractor engaged by defendant for the purpose.
It is undisputed defendant's experts were denied no information concerning the well, nor were they refused opportunity or facilities to make any tests they desired. On the contrary, defendant freely acknowledges his representatives were not hindered or impeded in their examination but rather that they were granted every courtesy, consideration and assistance by plaintiff's employees.
Upon completion of their scientific analysis of the hole, Blackwell and Kilbourne informed defendant the well was non-productive and, pursuant to instructions from defendant, directed plaintiff to abandon the well which plaintiff did by plugging the hole with cement and removing the drilling rig assembly.
On September 6, 1957, plaintiff billed defendant for the contract price of $35,500 but admittedly did not attach a copy of the well log thereto as provided for in paragraph or section 14.3 of the contract. Subsequently, plaintiff remitted statements on the first of each month until institution of this suit on September 6, 1958. Defendant neither responded to said communications nor paid the amount for which he was billed. However, in January, 1958, defendant contacted C. A. McCartney, plaintiff's Secretary-Treasurer, requesting a conference to discuss possible settlement of the tort claim defendant believed he had because of the accidental death of his son. During this conference, which was held on an undisclosed date in January, 1958, defendant ignored McCartney's request for payment of the amount due under *704 the drilling contract but expressed no dissatisfaction or displeasure with the manner in which plaintiff had performed its part of the drilling agreement. Instead, defendant suggested a method of settlement of the tort claim whereunder the amount due therefor would be paid by plaintiff's liability insurer to plaintiff who would receive said funds and devote same to the drilling of additional wells for defendant. When defendant was advised that the tort claim was a separate and distinct matter which defendant would have to settle with plaintiff's insurer, defendant became adamant and virtually declined further discussion of the matter. In this connection the record reflects defendant resented the presence of plaintiff's attorney during this conference and further that defendant felt somewhat inhibited in that he was not represented by counsel on this occasion. Following the aforesaid conference, plaintiff and defendant maintained contact relative to the matter by way of correspondence and telephone communication. Plaintiff supplemented its monthly statements with letters requesting payment and defendant responded by frequent solicitation of information which he desired in connection with his continued investigation of the facts and circumstances surrounding the fatal accident to his son, which information he apparently desired for use in filing suit against plaintiff and plaintiff's insurer to recover for the death of his said son. Defendant readily concedes that in none of these discussions or negotiations did he express or indicate the slightest dissatisfaction, objection or complaint to the manner in which plaintiff performed the drilling contract. To this point, defendant's entire demeanor and reaction created the clear and unmistakable impression that his failure to pay the agreed price was not based upon any alleged dereliction on plaintiff's part but solely on his belief the claim against plaintiff and plaintiff's insurer for the death of his son greatly exceeded the amount due plaintiff by defendant for the drilling of the well and the difference should be settled in the manner desired by defendant.
Defendant concedes that in August, 1958, he became aware of plaintiff's intention to file suit for the balance due under the drilling contract and upon so learning contacted McCartney and requested that plaintiff refrain from institution of suit. Defendant also acknowledges that during this discussion he advised McCartney that he, defendant, believed the issue between the parties was more than the contract price the reference being to the unsettled tort claim. Meanwhile, defendant received from his geologist a written report of the latter's findings and scientific appraisal of the well, sold a one-quarter interest in the leases preserved by the drilling of the well in question and retained the leases to the next delay rental date at which time he permitted the leases to expire. During this entire period defendant conceded he lodged no objection or complaint with plaintiff respecting the drilling of the well in question.
The pertinent portion of defendant's answer clearly indicates a general denial in the vaguest of terms excepting the sole allegation the well was not drilled to contract depth. On November 14, 1958, approximately fourteen months after completion of the well, defendant took the testimony of certain drillers employed by plaintiff on the well in connection with the tort action which had been filed to recover for the death of defendant's son. Said depositions revealed nothing of significance respecting the procedure which had been followed in the course of the drilling operations. On this same occasion defendant's deposition was also taken and in response to the request of counsel for plaintiff that he enumerate the contract violations attributed to plaintiff, defendant read a lengthy prepared statement which indicated he had carefully scrutinized each and every paragraph of the drilling contract with the view of discovering possible violations thereof. Even at this juncture, defendant's replies reveal that he had no concrete evidence upon which to found an accusation of breach of faith by plaintiff.
*705 Subsequently, in March, 1959, at the request of defendant's attorney, defendant was furnished copies of the daily drilling reports called for in Paragraph or Section 14.1 of the contract. Defendant's examination of these reports revealed, for the first time, that the results of the deviation tests called for in Paragraph 10.6 (known in the oil industry as a "Totco") were not entered on the daily drilling report. In effect defendant's entire position is predicated upon plaintiff's failure to record the results of such deviation tests in the daily drilling reports coupled with plaintiff's failure to furnish copies of said daily drilling reports and failure to accompany the initial statement by a copy of the well log as required by the contract.
Defendant contends there are two different kinds of drilling contracts or agreement. He asserts there is the ordinary contract by which the driller furnishes material, labor and equipment for a stated price per day under which circumstances the owner retains full control and supervision of the well and the contractor is only responsible for carrying out the orders and directives of the owner as to the method and depth of drilling. On the other hand, he argues the contract involved herein is known as a "turnkey contract" or one in which, for a specified contract price, the driller assumes absolute control of the work agreeing and obligating himself, without qualification, to drill a well to a certain depth and within a certain tolerated deviation. In the case of a contract of the character involved herein, esteemed counsel maintains the owner has no control over the work and can only look to the contractor to strictly comply with the provisions of the agreement. From this premise counsel argues that, in such circumstances, it is incumbent upon the contractor to allege and prove strict and absolute compliance with each and every contract term and provision. In this connection, counsel contends that since the contractor has agreed to produce a certain result, defendant is not obligated for the contract price until and unless plaintiff establishes the contract has been fulfilled to the letter.
It is significant to note that defendant does not contend deviation exceeds three degrees of vertical or that the well was not drilled to a depth of 9,000 feet or that he has sustained loss or damage as a result of plaintiff's default in performance of a contract provision. In substance defendant alleges merely that since plaintiff's employees did not enter the results of the Totco tests on the daily drilling reports and also neglected to enter certain other information thereon, defendant suspects that the required number of deviation or Totco tests may not have been performed as required. From the foregoing premise it is reasoned that if the Totcos were not run the hole may be excessively deviated, that it may be less than 9,000 feet in depth since a deviated hole 9,000 feet in length is not necessarily 9,000 feet below the surface and that if either condition exists he may have sustained damage as a result thereof. In this same connection, defendant contends the well was drilled primarily as an exploratory well to gather subsurface geological data for correlation and evaluation with other available data covering the area, therefore, it is essential that he know whether the exact contract depth was reached within the degree of deviation specified. We note, however, the record unquestionably reflects the well was a "wildcat well" drilled primarily in search of oil and not principally for the purpose of obtaining geological information.
Stated simply, plaintiff's position is that it contracted to drill the well to a stated depth and within a certain degree of deviation for the contract price of $35,500. Plaintiff further maintains it did, in fact, drill the well according to the contract terms and specifications, tendered the well to defendant who accepted same without objection, complaint, protest or criticism, tested it in accordance with approved, acceptable scientific principles, concluded is was non-productive and ordered it abandoned *706 as a dry hole. Plaintiff further maintains that proof that the well was drilled and accepted without objection, protest or complaint (which facts are conceded by defendant) constituted plaintiff's entire burden of proof.
As a general rule, a party suing to recover on a commutative contract must allege and prove performance of his agreement. LSA-C.C. 1913, Merritt v. Harang, La.App., 198 So. 386. However, the jurisprudence of this state is settled to the effect that upon substantial completion of a work, the contractor is entitled to the value thereof as constructed, the remedy of the owner, in the event of defects or imperfections therein, being the right to seek a diminution in the price to the extent of the loss or damage sustained by virtue of the contractor's failure to perform the work as agreed. McLemore v. Hemler, 4 La. App. 388; Merrill v. Harang, La.App., 198 So. 386; Cairy v. Randolph, 6 La.Ann. 202; Reimann Construction Co., Inc. v. Upton, La.App., 178 So. 528; Jack v. Henry, La.App., 128 So.2d 62.
There is also that line of jurisprudence which holds that unqualified acceptance of a work without objection, protest or complaint respecting the manner of its performance, bars or estops the owner from recovery of damages resulting from or the cost of repairing certain defects therein.
We note that in P. Oliver & Son v. Board of Com'rs of Lake Charles Harbor & Terminal Dist., 177 La. 157, 148 So. 12, (a case which involved a dispute arising before acceptance), the Supreme Court held an owner was estopped to place a contractor in default for failure of certain pilings in view of a contractual provision for inspection by defendant's inspectors.
In Delambre v. Williams, 36 La.Ann. 330, it was held that acceptance without objection estopped the owner from claiming damages for non-fulfillment of a provision regarding the cost of materials employed on a project.
Precedent also establishes that acceptance with the understanding that certain defects will be remedied does not bar recovery for the cost of remedying such defects. Costanza v. Cannata, 214 La. 29, 36 So.2d 627, Jack v. Henry, La.App., 128 So.2d 62. Authority also exists for the proposition that acceptance of a contract without objection or complaint bars recovery by the owner of the cost of repairing patent defects or imperfections discoverable upon reasonable inspection. Delambre v. Williams, supra, Mitchell v. Curell, 11 La. 252, A. M. Blodgett Construction Co. v. Cheney Lumber Co., 129 La. 1057, 57 So. 369, Jack v. Henry, supra.
The rule with respect to patent defects or defects discoverable upon reasonable inspection does not apply to latent defects or those not discoverable upon ordinary inspection, neither does it apply with respect to defects becoming manifest subsequent to acceptance. Svendson v. American Indemnity Co., La.App., 76 So.2d 737, Seminary v. Blair, La.App., 52 So.2d 877, Jack v. Henry, supra.
On the issue of burden of proof which appears squarely presented in the case at bar, it appears the jurisprudence is established to the effect that where the owner admits the contract and the fixing of the price for the entire work but seeks to escape liability for payment of all or any portion of the contract because of alleged defects in the work or the contractor's failure to complete the work according to contract plans, terms or specifications, the owner bears the burden of proving the defects complained of. Merrill v. Harang, La.App., 198 So. 386; Annan v. Woods, 158 La. 663, 104 So. 491; A. M. Blodgett Construction Co. v. Cheney Lumber Co., Ltd., 129 La. 1057, 57 So. 369; Borne v. Hardin, 15 La.App. 286, 131 So. 472. The effect of acceptance upon the burden of proof as enunciated in the hereinabove cited authorities of this state appear to be in accord with the general rule on the subject matter stated in 17 C.J.S. Verbo Contracts, § 590, b, (1), p. 1231 as follows:

*707 "The burden of proving acceptance is on the party asserting it. An acceptance or a voluntary use of the subject matter of the contract will be evidence, although not conclusive evidence, of performance or of a waiver; but, if such acceptance or use is in ignorance of any deficiency of performance, it will not be held to be a waiver. Under such circumstances, however, the burden of showing defective performance rests on the party alleging it."
Granting defendant's unqualified acceptance constituted a waiver of only his right to recover the cost of rectifying defects discoverable on reasonable inspection, the rule regarding hidden or latent defects as well as those which become manifest only after acceptance has no application to the case at bar for the reason defendant (in an obvious attempt to escape the burden of proof) has most carefully refrained from alleging a specific breach or failure on the part of plaintiff with respect to the manner in which the drilling of the well was required to be performed under the contract provisions. We also note defendant's failure to allege or prove the slightest damage or loss because of dereliction in duty on the part of plaintiff herein. The gravamen of defendant's present complaint is not that he has been damaged but rather that he may have been damaged and further that he is not presently in a position to determine whether he has or has not in fact sustained loss because of plaintiff's failure to keep certain records required by the contract.
The testimony of plaintiff's witnesses creates the inference that the disputed Totco tests were run although the testimony of at least one driller employed on the well casts some doubt on this score. It appears from the record that it is customary in the industry to keep the records of such tests in what is known as a Totco Box which is maintained on each rig and discard them after completion and testing of the well since they are thereafter of no value irrespective of whether the well is productive or dry. Both parties recognize it is now impossible to determine whether the well did in fact reach the contract depth within the degree of deviation called for. It is also conceded that whereas the results of Totco tests made during drilling operations are customarily accepted as accurate they are not necessarily so because the authenticity of their reflections may be affected by the condition of the equipment used and the skill of the driller who conducts the tests. The record also establishes that upon completion of a well the only positive and absolutely accurate method by which true deviation may be determined is to run a directional survey thereon. It is acknowledged that neither plaintiff nor defendant conducted a directional survey of the well in question although by custom in the trade, as well as under the provisions of his contract, defendant clearly had the right to make a directional survey if he so desired.
It further appears from the testimony of defendant's geologist and engineer that, in accordance with approved, acceptable procedure they presumed the hole to be "straight" because the statutory law of this state on the subject matter so requires. They further testified they did not examine the Totco discs in the instant case as they had no reason to suspect excessive deviation. They assumed the hole to be within the tolerated deviation figure because deviation is rarely checked except in unusual instances where it is known to be a factor such as where a well is drilled near a lease line and there is danger of encroachment upon property outside the lease or where a well is intentionally directionally drilled and a specified deviation is contemplated and desired. Both Blackwell and Kilbourne freely admitted they were given every opportunity to test the well in whatever manner they wished and that they did in fact test it to their complete satisfaction. Both stated, however, there was, under the curcumstances, no way of positively determining exact depth and deviation. Their *708 testimony is likewise clear to the effect that whereas they could not tell that the hole was in fact straight they had no reason to suspect it was not so.
That defendant received substantial benefits from the well is amply demonstrated by his own testimony. He acknowledges the drilling operation fulfilled a contractual obligation on his part but for the performance of which he would have forfeited mineral leases covering large tracts of land. Defendant further admits that, following completion of the well in question, he sold a portion of the leases thus preserved receiving a substantial sum therefor. The record leaves not the slightest doubt defendant realized considerable financial gain and return as a result of plaintiff's performance and obtained virtually all benefits anticipated therefrom except that the well proved to be a dry hole instead of yielding oil in paying quantities which latter result plaintiff did not guarantee under the drilling contract.
Granting plaintiff has not affirmatively established completion of the well as agreed and further that plaintiff failed to furnish defendant daily drilling reports and neglected to attach a copy of the well log to the bill submitted to defendant on completion as required by the contract, it does not necessarily follow that the well was not completed in accordance with the contract terms and specifications.
Defendant's unconditional and unqualified acceptance of the well without objection, protest or complaint unquestionably lulled plaintiff into believing defendant was satisfied with the result and would pay the contract price agreed upon. This appears especially true in view of the uncontradicted evidence to the effect that upon completion of the well, defendant's geologist and petroleum engineer spent at least 12 hours in examining and testing the well aided by plaintiff's employees who admittedly assisted and cooperated with defendant's representatives in every respect and accorded them every possible opportunity to conduct whatever tests they deemed necessary or advisable in defendant's interest. In this regard the evidence further shows that plaintiff did not plug the well until after defendant's experts conducted complete and exhaustive scientific examination and evaluation thereof and were instructed by defendant to inform plaintiff to plug the well and remove the drilling rig. Had any protest, objection or complaint been lodged by defendant or his representatives before or upon completion of the final appraisal of the well or had plaintiff been given any reason to believe or suspect defendant would dispute the manner of performance, plaintiff would have been placed on guard and could have conducted tests of it own to determine whether defendant's complaints were well founded. More specifically, had defendant disputed the degree of deviation as he now seeks to do plaintiff could have run a directional survey to settle such dispute beyond question. Defendant's unconditional acceptance having prompted the circumstances which renders proof impossible (namely the cementing of the well upon defendant's direction), it is not seemly that defendant call upon plaintiff to produce such proof.
Under the clear and express provisions of the contract defendant had the unqualified right to survey the hole at any time either during the drilling process or after completion. He freely concedes he did not do so and explains his failure in this regard by stating that since the contract was a turnkey job he relied exclusively upon plaintiff's contractual obligation to achieve a specified result. His position in this regard is, however, clearly without merit for reasons hereinabove set forth.
It seems reasonably clear from defendant's own testimony his refusal to pay the contract price was purely an afterthought which occurred long subsequent to his acceptance of the well and receipt of benefits arising therefrom. It appears equally clear his decision in this regard was prompted by his resentment of plaintiff's refusal to settle the unrelated, outstanding tort claim *709 for the death of defendant's son in the manner suggested and desired by defendant.
We believe the instant case comes squarely within the rule that acknowledgment by an owner of his execution of a contract for an agreed price and subsequent unconditional and unqualified acceptance of the work tendered him by the contractor as completed in accordance with the terms of the agreement, imposes upon such owner the onus of proof of an alleged breach thereof. The foregoing rule is peculiarly applicable to the facts and circumstances of the case at bar considering defendant was specifically given the right, privilege and opportunity to inspect the well at any time and did, in fact, conduct a detailed examination thereof before ordering same abandoned. Defendant's decision to abandon the well and his authorization of plaintiff's action in plugging the hole (in accordance with usual practice in the industry) is solely responsible for the fact that the disputed issue is presently impossible of resolution one way or the other. Under such circumstances defendant, being incapable of discharging the burden of proof resting upon him, may not prevail herein.
Considering this matter involves a complex and perplexing legal issue we do not deem defendant's appeal frivolous and, therefore, reject plaintiff's demand for damages as for a frivolous appeal.
Judgment affirmed.
HERGET, Judge (dissenting).
Justiss-Mears Oil Company, Incorporated, Plaintiff herein, a corporation engaged in the drilling of oil wells, instituted this suit annexing thereto and making part thereof a true copy of a contract executed and entered into on August 13, 1957 by and between it and defendant, C. B. Pennington, wherein, under the terms thereof, it obligated itself to drill a well designated as "Howell Number 1" in the Parish of East Feliciana to a depth of 9,000 feet for the consideration of $35,500.
In paragraph 4 of its petition, Plaintiff alleged:
"That your petitioner actually commenced operations for the drilling of said well on August 9, 1957, and completed the well in accordance with the contract and to the contract depth on September 3, 1957;".
In answer to paragraph 4 of Plaintiff's petition Defendant alleged:
"For answer to paragraph 4 of plaintiff's petition defendant admits that petitioner commenced drilling operations on August 9, 1957, but defendant denies that petitioner completed the well in accordance with the contract or to the contract depth." (Italics mine.)
After a lengthy trial the Trial Court, for written reasons assigned, rendered judgment in favor of the Plaintiff and against the Defendant on October 7, 1960, which judgment was read and signed on October 18, 1960, in the sum of $32,850.12 with legal interest from September 6, 1957 until paid and all costs of these proceedings. The amount of the judgment represented the sum sought in the petition of $35,500 less a credit of $2,649.88 admittedly owed by Plaintiff and conceded to be a proper credit due Defendant for a Schlumberger test charged to Defendant.
In the contract the following provisions become important in resolving the issues involved, that is, whether or not Plaintiff completed its contract with Defendant in accordance with the contract and is therefore entitled to judgment in its favor for the completion of said contract, viz.:
"10. Drilling Methods and Practices:

* * * * * *
"10.6 Contractor agrees to drill the well in such a manner that its deviation from vertical shall at no time exceed the deviation limits specified in Par. 3 of Exhibit `A', and shall make vertical *710 deviation surveys without cost to Owner at least once every five hundred (500) feet with standard instruments and equipment acceptable to Owner. When the hole is found to be more than the permissible degrees off vertical, Contractor, if requested by Owner, shall cement off and redrill or otherwise straighten the hole to the satisfaction of Owner. Owner reserves the right to survey the hole with his own equipment at any time and at any depth during the course of the drilling operations, but the time required for such surveys shall be paid for at the applicable day work rate. Cementing off and redrilling or straightening any hole drilled on footage basis with more than permitted deviation shall be at the Contractor's expense. The time required to cement off and redrill or straighten any hole drilled on day work basis shall be paid for by the Owner at the applicable day work rate.
"11. Completion Tests and Installation of Well Connections:
"11.1 Contractor agrees, when making a completion test of the well, to run tubing and to swab the well at the request of Owner, with swabbing equipment furnished by Owner, for a length of time sufficient to make certain that the hole is free of drilling mud or water or both. Regardless of depth, Contractor, at applicable day work rate, shall continue the work of swabbing or hold Contractor's rig while pumping or flowing tests are being made, for such length of time as Owner may deem it necessary for completion of the well in accordance with his wishes; or, if requested by Owner to do so, Contractor shall plug and abandon the well, at the applicable day work rate.

* * * * * *
"14. Reports to Be Furnished by Contractor:
"14.1 Contractor shall keep and furnish to Owner a daily drilling report on forms provided by Owner or in the manner designated by Owner. This report shall be open to inspection by Owner at all times.

* * * * * *
"14.3 Contractor shall keep an accurate log of the well, giving depth and thickness of each formation from the surface of the ground to the bottom of the hole, and will attach one typed copy of the well log to the final bill when it is presented to Owner for payment."
Though the contract provided that the well be drilled in such a manner its deviation from vertical shall at no time exceed the limits specified in Par. 3 of Exhibit "A" of the contract, which exhibit provides a deviation to the contracted depth of not more than five degrees, Plaintiff and Defendant conceded that Order No. 29-B of the Department of Conservation of Louisiana requires that "No well shall be drilled laterally at any point a distance greater that that determined by a three (3) degree angle from a vertical line passing through the center of the surface location of the well bore. * * *." Therefore, the obligation undertaken by Plaintiff was to drill a well 9,000 feet in depth with no more than a 3 degree deviation from vertical.
This well concededly was drilled for Defendant for the purpose of discovering oil and to obtain geological information therefrom pertinent to the area in which said well was located. From tests made by geologists they were able to obtain information as to subsurface formations from which they were in a position to form opinions as to the strata in the surrounding areas. For this information to be of any value and to correctly corroborate their opinions as to the surrounding areas it is essential that the depth of the particular strata tested be known, for their opinions at various depths must, of necessity, be based on findings and geological information obtained at known depths.
In the drilling of an oil well to a specified depth of 9,000 feet vertical within 3 degrees *711 of deviation, if excessive deviation takes place, though the length of the drilling may be 9,000 feet the vertical depth of the well is concededly less than 9,000 feet.
Under the terms of the contract in order to show the deviation of this well from vertical an instrument known as a "Totco" was utilized which, the record shows, is an instrument dropped in the hole that registers the deviation by punching in a circular piece of paper contained therein a small hole. The circle in the paper is marked like a target and a bull's eye means that the hole is vertical so that the more distant the hole in the paper is from the bull's eye the greater the deviation. After the tests are made, according to the transcript, these discs are taken from the mechanism, marked at the depth at which the tests were made and other information recorded and placed in an envelope in the Totco box during the duration of the drilling. Though this method is customary procedure, the pertinent provisions of the contract quoted hereinabove require that such information be recorded on the log kept by the driller which is a record made by him at the time of the making of such tests and other operations and, as noted by the provisions of the contract referred to, Plaintiff was required to furnish to Defendant a copy of this log along with the bill for the contract price at the termination of the contract. Under the contract the Plaintiff was required and obligated to make Totco tests every 500 feet or 18 tests in all.
It appears from the testimony in the negotiations by which this particular contract was entered into it was understood and agreed that the Plaintiff, who had previously drilled a well for the Defendant at another location, known as "Colonial's No. 1", agreed to undertake the performance of this contract under the same terms and conditions as was the Colonial contract. In that operation the evidence reveals that actual Totco tests were made every 500 feet, the record of the finding was made in the log of the well and at the completion of the contract and upon submission of the bill for the contract price a complete log of the well was furnished to the Defendant. In the instant case corroborative evidence was offered that only three Totco tests were made and that of the three the results of only one test showing deviation was recorded. The Trial Judge in his written reasons for judgment found "* * * Only three totco tests were reportedtwo are found on the daily drilling record of August 18 at 4,810 feet and of August 24 at 6,918 feet (D-2), and one was called to plaintiff's office on August 16 at 3,300 feet (D-5). This last one shows a deviation of one-half degree. The other two records do not show the deviation if any."
Counsel for Defendant maintain that the reason why said records do not reflect the deviation is apparent is because the instrument available to Plaintiff could have been used at the depth of 3,300 feet but at the depth of 4,810 feet and 6,918 feet, because of the diameter of the pipe, the instrument could not be used. The evidence reflects that Defendant earnestly contended that Plaintiff in fact did not make the Totco tests required under the contract. In substantiation of this contention evidence was offered that this being a "slim hole" operation, to make the tests it would have been necessary for Plaintiff to have obtained a special Totco of 1 5/8 inch diameter to fit into the small 2 7/8 inch drill stem assembly. In this connection Defendant offered the testimony of Mr. Ivan Childs who testified that he was employed by Technical Oil Tool Corporation, commonly known as "Totco", and was in charge of its area office in the vicinity of which this well was located the entire period while this well was being drilled; that there was no record whatever of any Totco of the size necessary to fit into the slim hole drilled under this contract having been leased to Plaintiff at that time; that if such instrument had been leased to Plaintiff it would have come through his office; that if such instrument had been leased he would have made an inspection of same on the drilling site and that he made no such inspection. From *712 his testimony it appears that if in fact this instrument had been rented from Totco he would have had knowledge of same. Counsel for Plaintiff discounted his testimony by maintaining the instrument could have been obtained without a record having been made of it and in the course of cross-examination they produced evidence of the presence of Totco instruments in the area of which he was not aware. Nevertheless, despite the testimony of Mr. Childs, Plaintiff produced no records to show where it had obtained an instrument of the size essential to make the Totco tests in this well but relied on the general testimony of its employees to the effect that Totco tests were made in accordance with the contract. It appears to me that upon the showing made by Defendant, such evidence should have been available to Plaintiff and the production thereof would be of prime importance in proving Plaintiff's assertion that Totco tests were made.
On the trial of the issue evidence was offered that upon being furnished information as to the daily progress of the well at the beginning of the drilling, Defendant advised Plaintiff's employee he did not care to be given daily progress records. There it a divergence in the testimony of Plaintiff and Defendant as to what information Defendant did or did not want in the daily report furnished to him but, assuming Defendant did relieve Plaintiff of the obligation of furnishing a daily report, under no circumstances can this be enlarged to except from Plaintiff's obligation the actual making of the Totco tests in compliance with its contract.
In their argument before this Court counsel for Defendant maintained strenuously that the contract involved herein is what is known as a "turnkey" contract under which Defendant had no right to interfere in any way with the operations of Plaintiff in drilling the well. This is true to the extent that Defendant could not interfere with Plaintiff in the performance of the contract, but it did not exclude the right to Defendant, if he saw fit, to make deviation tests, which right, under the contract, was specifically reserved to him. Though, however, such right was reserved to Defendant, there is no evidence whatever that he or any of his employees did, in fact, make deviation tests. Furthermore, there is no evidence or corroborative proof offered other than in the three instances referred to hereinabove that Plaintiff made such Totco tests and communicated such results to Defendant. If such deviation tests had been made by Plaintiff and had been communicated to Defendant the question of (a) whether or not records of such tests had been made would become immaterial; or (b) if the evidence revealed that Defendant or his employees had made independent tests to determine the deviation and made no complaint to Plaintiff in this respect, it could be logically contended that by such acts Defendant had satisfied himself that the well was completed in accordance with the contract. However, the evidence is barren of any testimony to the effect that the Defendant or his agents at any time made deviation tests or at any time even raised the question as to whether or not such tests had been made. When Defendant was notified by Plaintiff that the well had been completed to its contract depth, he dispatched a geologist to the site for the purpose of determining from the Schlumberger test where the sidewall cores should be taken from or determine if completion should be attempted. Plaintiff contends that such geologist could have at that time raised the question as to the deviation of the well and the determination could have then been made. It is significant, from the testimony, that geologists required to perform the duties assigned to Defendant's geologist on this occasion do not question the deviation in the well but assume that same has been drilled within three degrees from vertical. Defendant's geologist was not instructed to check the deviation of the well and his testimony is that he did not do so.
Upon Plaintiff's notification to Defendant that it had completed the well to the contract *713 depth, implicit in such communication was the affirmation that the well had been drilled to the contracted depth within the degree of deviation provided by the contract and Defendant by his acceptance without knowledge of the failure on the part of Plaintiff to make the deviation tests and record same in the log in accordance with the contract did not thereby accept the well as having been drilled in accordance with the contract and by such acceptance he is not estopped from denying that the well was drilled in accordance with the contract and calling on Plaintiff to affirmatively prove its performance. Defendant, under the contract entered into by and between him and Plaintiff, has the legal right to require Plaintiff to prove compliance with its contract to drill a well for him to the depth of 9,000 feet within a tolerance of three degrees from vertical, and for Plaintiff to recover judgment from Defendant proof of such fact must be made by a preponderance of the evidence as in all civil cases.
The Trial Court did not find as a fact that this well had been drilled to a depth of 9,000 feet within three degrees of vertical as required by the contract between the parties. Its judgment in favor of Plaintiff and against Defendant was predicated on a prima facie showing of that fact and upon the failure on the part of Defendant to prove excessive deviation and, though it held if there were evidence of excessive deviation the Defendant had not received that consideration for which he contracted and would not be required to pay the price, it erroneously, in my opinion, placed the burden on Defendant of proving excessive deviation.
After the hole was plugged there now is no way to determine the deviation so that unless Plaintiff was then able to prove such fact from witnesses and from its records in its possession, the Plaintiff had no proof or no way of securing proof that the well was drilled within the degree of deviation from vertical allowed to the depth contracted for. In the supplemental brief filed by Plaintiff-Appellee in this Court, it is conceded that Plaintiff did not prove the well was drilled vertically unless such fact is concluded because of the acceptance by Defendant, as shown by an extract from said brief, as follows:
"We, therefore, would like to correct the impression if it was given, that the contractor kept no record at the time of the running of the Totco tests. What this contractor did not do was keep completely useless records over a year after the owner had accepted the hole, and given no indication that he had any complaint whatever on the slightest interest in such records.
"Secondly, we would not like for the Court to get the impression that plaintiff offered testimony or in any way assumed a burden of proving at the trial that the tests were made. It was plaintiff's position throughout that proof the well was drilled and accepted completed its entire burden of proof. Our position at the trial was, and is now, that far from our having this burden, defendant had no right to even raise the question a year and a half after acceptance. Even if he had proof of actual violation, this was inadmissible. Rightly or wrongly, we have never feared that any Court would hold that the defendant could accept and use this well to the fullest extent, order it plugged, pretend as long as possible that he was satisfied so the records would be thrown away, defend the lawsuit on other grounds, and then on trial demand the plaintiff prove what is now, by defendant's acts, unprovable. We freely admit that as of the date of the trial, we could not prove the hole was vertical. * * *"
The majority in its opinion erroneously, in my opinion, rests its decision on the not disputed well settled law of this State that upon the substantial performance of a contract and acceptance by the owner, the burden of proof then shifts to the owner to *714 prove damages, if any suffered by him, resulting from defective performance. The reason such doctrine is inapposite to the resolution of this case is very simple in that in the cases relied on, the Court, in giving effect to the principle, finds as a fact from the evidence that the contract has been substantially performed; whereas, under the evidence offered on the trial of this case, the only basis for this Court to say that this contract was substantially performed is to simply say so without proof of such fact. The obligation of Plaintiff was to drill a well 9,000 feet vertical within three degrees. Upon performance of such obligation Defendant agreed to pay the consideration therefor. The majority by its holding that Plaintiff substantially performed its contract necessarily concludes that Plaintiff did in fact drill the well 9,000 feet vertical within three degrees. Defendant did not concede that the contract had been substantially performed but that defective performance in some respects entitled him to damages but in his original answer quoted in part, supra, specifically denied that petitioner had completed the well in accordance with the contract or to the contract depth and called upon Plaintiff to prove such fact as, under the law, in my opinion, he had a right to do.
Illustrative of the principles of law which I believe to be pertinent to the resolution of this caseassume that John Doe, Contractor, undertakes to erect a building for Richard Roe specifying foundation to be 6 foot reinforced concrete slab placed on concrete piles spaced at 10 foot intervals and to a depth of 60 feet, the contractor allegedly completes the performance of the contract and tenders the building to the owner who accepts same but, before payment, is informed that the piles were driven to only a depth of 30 feet, whereupon he declines payment. Upon suit on the contract and a showing by the contractor that the building had been completed substantially in accordance with the contract, in my opinion the Court might justifiably so conclude and place on the owner the onus of proving that the piles were driven to only 30 feet and not 60 feet and the damages sustained by him because of such defective performance, as the erection of the building was the purpose of the contract. The well settled principles of law followed by us in Jack v. Henry, La.App., 128 So.2d 62 would be controlling.
Now, assume that John Doe, Contractor, enters into a contract with Richard Roe only to supply and drive concrete piles to a depth of 60 feet at ten foot intervals, the specified depth being essential to support a building he intends to erect. On the representation of the contractor that he has performed the contract and without independently determining the piles have been driven to the specified depth the owner accepts but prior to payment the owner has reason to believe that the piles were not driven to the specified depth, whereupon he declines payment. Upon suit on the contract and upon denial by the owner that the piles had been driven to the specified depth the burden of proof would rest on the contractor as the purpose of the contract was to drive the number of piles to the specified depth. The Court would not be warranted in holding that the contract had been substantially performed and require the owner to prove damages for defective performance but, as it was essential that the piles be driven to a depth of 60 feet, it could only grant judgment in favor of the contractor upon his proving by a preponderance of the evidence the performance of the contract.
In the case before us, it was essential that the well be drilled to the specified depth to make of any value the geophysical information as to the surrounding area. This was the purpose of the contract.
The law appropos to the resolution of this case is found succinctly stated in 17 C.J.S. Contracts § 590, p. 1230:
"A party alleging performance of a contract as the basis for recovery has the burden of proof, when such fact is *715 put in issue. So, where defendant pleads performance, he assumes the burden of proof. * * *"
In my opinion to enable Plaintiff to recover from Defendant the contract price for the drilling of this well, it is essential that Plaintiff prove by a preponderance of the evidence that Defendant received the consideration for which he contracted, namely: a well to the depth of 9,000 feet within three degrees of vertical. From my examination of the evidence, Plaintiff failed to make such proof.
For these reasons, I respectfully dissent.