**WORTHINGTON CORPORATION,**
**Plaintiff-Appellee, Appellant,**

v.

**CONSOLIDATED ALUMINUM CORPORATION (formerly Gulf Coast Aluminum Corporation), and Parish of Calcasieu, State of Louisiana, Defendants-Appellants, Appellees.**

No. 75–3058.

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1976.

Rehearing Denied Jan. 24, 1977.

Robert W. Clements, Lake Charles, La., for defendants-appellants, appellees.

Frank J. Peragine, James A. Burton, New Orleans, La., A. Lane Plauche, Lake Charles, La., for plaintiff-appellee, appellant.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

GEE, Circuit Judge:

Relying on diversity jurisdiction, Worthington Corporation filed suit in Louisiana federal district court to recover the balance of the contract price for construction of a power plant for Consolidated Aluminum Corporation.[1] Under the contract between the parties, Worthington was responsible for both designing and constructing an isolated power plant to meet all of Consolidated's energy needs for an aluminum manufacturing complex in Lake Charles, Louisiana. In addition to the $1.1 million contract balance, Worthington also claimed entitlement to a $300,000-plus heat rate bonus provided under the contract if the efficiency of the power plant exceeded a specified energy rate.

Consolidated defended on the ground that Worthington had not substantially performed according to the contract terms, asserting "design deficiencies" in the completed plant. Consolidated also counterclaimed for damages in excess of $4 million, allegedly caused by Worthington's failure to complete the power plant upon the specified contract date. The trial judge severed the counterclaim from Worthington's demands and entered a partial summary judgment that any delay damages were limited by specific terms of the contract to liquidated damages of $500 per day, in no event to exceed $100,000.

After a two-week trial on the remaining issues, the jury returned the following answers to special interrogatories:

(1) Worthington had not fully completed all of its obligations under the contract; (2) Worthington had, however, substantially completed the contract; (3) the cost of fully completing the contract was $287,260; and (4) Worthington had earned the heat rate bonus provided in the contract. The court entered judgment on the verdict and denied the parties' motions for judgment n. o. v. and for new trial. Both parties appeal from portions of the judgment.

Consolidated urges the following grounds of error:

1. The district court erred as a matter of law when it permitted to stand the jury's determination that the contract for design and construction of the power plant had been substantially completed.

2. The trial court committed reversible error in taking from the jury the question of the adequacy of three gas jet-engine turbines on the issue of substantial completion.

3. The evidence was insufficient to support the jury verdict that Worthington had

1. Although the actual contracting parties were Worthington and the Parish of Calcasieu, Consolidated was named as a party beneficiary and was in fact, if not in form, the party with whom Worthington contracted. The trial judge determined that the Parish did not have sufficient interest in the case for judgment to be entered against it. Accordingly, we shall regard the contract as between Worthington and Consolidated.

earned the heat rate bonus under the contract.

4. The district court erred in granting Worthington's Motion for Partial Summary Judgment on Consolidated's counterclaim for delay damages.

5. The trial court erred in granting legal interest from the dates the respective contract payments allegedly became due rather than from the date of judicial demand.

Worthington's appeal challenges only the $287,260 cost-of-completion offset allowed against its contract balance claim, contending that the district court erred as a matter of law when it permitted to stand the jury's determination that the cost of remedying alleged design deficiencies should be deducted from the balance of the contract price due.

### Consolidated's Appeal

■ 1. Substantial completion.—Under Louisiana law, if a contractor has substantially performed a building contract, he is entitled to sue on the contract for recovery of the contract price less the cost of completion. *Airco Refrigeration Service, Inc. v. Fink,* 242 La. 73, 134 So.2d 880 (1961). In the instant case, Consolidated resisted Worthington's attempt to recover the remainder of the contract price by contending that Worthington had failed to substantially perform its contract obligation to *design* a power plant to meet the needs of Consolidated's aluminum complex for steady, dependable electrical energy. At trial, Consolidated sought to show that nineteen alleged "design deficiencies" made the power plant substantially inadequate for its intended use.

■ All of the experts who testified at trial about the plant's design had been directly involved to some degree with the power plant construction or operation on behalf of either Worthington or Consolidated. As to each of the nineteen claimed design deficiencies, Worthington's experts testified that each item represented a "good design" in accordance with applicable engineering principles. Consolidated experts, on the other hand, opined—as to the same nineteen items—that they represented bad or defective designs in violation of engineering standards. The jury resolved this sharply disputed issue in Worthington's favor, answering in response to a special interrogatory that Worthington had substantially completed the contract. As its first point of error, Consolidated contends that the trial court erred in allowing this jury finding to stand. A review of the record reveals more than enough evidence to support the jury's answer and to justify the trial court's refusal to grant judgment n. o. v. on this issue. A general sufficiency-of-the-evidence challenge to the jury's finding of substantial completion therefore fails.

Consolidated, however, raises two specific sub-points attacking the finding. First, Consolidated urges that the trial court improperly instructed the jury as to what constitutes substantial completion. In *Airco Refrigeration Service, Inc. v. Fink, supra,* the Louisiana Supreme Court, drawing from earlier cases, observed:

> The principal question presented in this case is whether or not there has been substantial performance so as to permit recovery on the contract. This is a question of fact. Among the factors to be considered are the extent of the defect or non-performance, the degree to which the purpose of the contract is defeated, the ease of correction, and the use or benefit to the defendant of the work performed.

134 So.2d at 882. Consolidated, arguing that *Airco* requires equal consideration of the four listed factors, contends that the trial court placed undue emphasis upon the usefulness of the plant for its intended purpose.

■ At the outset we note that alleged error in jury instructions is not properly raised on appeal by a complaint of insufficient evidence to support a jury finding. However, even if the point had been properly presented, we would not hold the instruction erroneous. The challenged portion of the court's charge reads:

> Under Louisiana law, substantial performance is a question of fact and a

*primary factor is whether the plant can be put to the use for which it was originally intended.* In making this determination and the determination of whether or not there has been substantial compliance you should consider the extent of the alleged defects as compared to the total contract. You should consider the degree to which the purpose of the contract may have been defeated. You should consider the ease and the cost of corrections in relation to the entire undertaking and the use or the benefit to the owner of the work performed.

Appendix, vol. 4, at 1272–73 (emphasis added).

The *Airco* case relied upon by Consolidated contained no question relating to jury instructions; and contrary to Consolidated's contention, nothing in the *Airco* opinion indicates that the factors mentioned by the court are the exclusive considerations or have to be given equal weight in determining substantial completion. In addition, the charge employed by the court in the instant case is substantially the same as the charge in *C. H. Leavell & Co. v. Board of Commissioners of Port of New Orleans,* 309 F.Supp. 626, 629 (E.D.La.), aff'd, 424 F.2d 764 (5 Cir. 1970). *See also Jerrie Ice Co. v. Col-Flake Corp.,* 174 F.Supp. 21, 25–26 (E.D.La.), aff'd, 278 F.2d 508 (5 Cir. 1960). In the absence of some case specifically questioning the correctness of these charges or some showing that they are inherently inconsistent with *Airco,* we see no basis for holding that the court's charge in the instant case was improper. Moreover, Consolidated's objection to the court's emphasis upon usefulness for the intended purpose is substantially weakened by Consolidated's own position on the proper form of interrogatory. The following colloquy occurred between counsel for Consolidated and the court:

MR. CLEMENTS: * * * * I did make the request of Your Honor that interrogatory number one read as follows: Was the contract by Worthington for the design and construction of the power plant completed in its entirety *for the purposes for which it was intended?* And with regard to interrogatory number two: Was the contract by Worthington for the design and construction of the power plant substantially completed *for the purposes for which it was intended?*

THE COURT: Well, what, in effect, you would have me to do, sir, is to add, for the purposes which intended?

MR. CLEMENTS: That's correct, Your Honor.

THE COURT: The Court feels it has taken care of that by the instructions.

Appendix, vol. 4, at 1371–72 (emphasis indicates change sought by Consolidated).

We fail to see how the court's emphasis on intended use, buried in a long jury charge, could have improperly weighted the jury's consideration more than if the language sought by Consolidated had been included in the interrogatories. It is apparent that Consolidated affirmatively sought emphasis on whether the plant could be put to its intended use. The court chose to place this requested emphasis in the charge rather than in the interrogatories themselves, an entirely proper and permissible choice. The major thrust of Consolidated's case was that even though the power plant built by Worthington did, in fact, produce power, the plant failed to produce the consistent, reliable power requisite to the particular use for which it was intended: the production of aluminum. Thus, any undue emphasis upon whether the plant could be put to its intended use inured to Consolidated's benefit. If it was error at all, it was clearly harmless error so far as Consolidated is concerned.

2. *Adequacy of gas turbines.*— Consolidated's second point attacking the finding of Worthington's substantial completion is that the trial court erred in taking from the jury the question of the adequacy of three gas turbines used in the plant. We assume that Consolidated challenges the lower court's action as a partial directed verdict, which this court should review under standards applicable to directed verdicts. *Boeing Co. v. Shipman,* 411 F.2d 365 (5 Cir. 1969) (en banc), set forth the standards governing directed verdicts and judg-

ments n. o. v. The court is to view all of the evidence in the light and with all reasonable inferences most favorable to the opposing party. If the evidence is so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict, granting directed verdict or judgment n. o. v. is proper. On appeal the court is to apply the same standard. *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835 (5 Cir. 1975).

The evidence at trial showed that Consolidated's original specifications called for a combined-cycle power plant in which three generators would be powered by gas turbines and two generators would be powered by conventional steam turbines. Worthington's bid proposal and the final contract specifications called for the gas turbines to be powered by jet aircraft-type engines manufactured by Pratt & Whitney Aircraft. Consolidated contended that Worthington had represented that these jet gas turbines would provide a minimum running time between overhauls (TBO) of 10,000 hours. In support of this claim Consolidated witnesses testified that a Pratt & Whitney brochure had been included in the original looseleaf "proposal book," which became part of the final contract. The Pratt & Whitney brochure provided:

> Gas turbine maintenance generally varies and is dependent on the operational rating and the fuel type utilized.
>
> \* \* \* \* \* \*
>
> Currently, industrial jet gas turbines produced by the authors' companies are in the 8000–16,000 base load hour TBO (Time Between Overhaul) category.

Appendix, vol. 4, at 1458.

Worthington witnesses denied that the brochure had been included in the proposal; but they also urged that even if included, such manufacturer claims would never be viewed as a contractual or warranty obligation by the general contractor that the jet engines would provide the stated average running time.

Consolidated also pointed to a Maintenance Contract with Worthington executed at the same time as the construction contract. Under the maintenance agreement, Worthington agreed to bear the cost of any overhauls on the jet gas turbines which became necessary at intervals of less than 10,000 hours TBO; Consolidated would pay for overhauls when the TBO exceeded 10,000 hours. Consolidated argued that the TBO estimates in the Pratt & Whitney literature, plus the Maintenance Contract with its provision of a 10,000-hour TBO as the dividing point for overhaul-cost responsibility, proved that Worthington had contractually obligated itself to provide gas turbines with a minimum TBO of 10,000 hours. Consolidated further contended that it was induced by these alleged representations, and had relied upon them, to enter into the construction contract with Worthington.

At trial Consolidated showed that its actual experience with the jet gas turbines had resulted in an average TBO of only 4000–5000 hours. This great discrepancy between the "promised" 10,000-hour TBO and the actual TBO, argues Consolidated, constitutes a defect of such magnitude as to negate Worthington's claim of substantial completion. To remedy this defect—*i. e.,* to increase substantially the TBO—Consolidated contends that it would have to replace the jet aircraft-type gas turbines with heavier industrial-type gas turbines at an estimated cost in excess of $3.3 million.

Consolidated further argues that Worthington's very choice of jet gas engines rather than the heavier, allegedly more reliable industrial-type gas turbines constituted a design defect of such magnitude as to render the power plant substantially incomplete for the purpose of powering an aluminum plant. This represents a claim separate from any specific contract guarantee of TBO. The only evidence offered by Consolidated, however, to show that Worthington should have chosen the industrial-type gas turbines is the testimony of Consolidated witnesses that their experience with the jet gas engines has now convinced them that industrial-type turbines would be better. In addition, Consolidated introduced a statement from a 1971 or 1972 Worthington

annual report indicating that in 1971 Worthington began to switch to use of industrial-type turbines in response to demands from its utility company consumers. No evidence whatsoever indicates that at the time of planning and beginning the construction of the power plant for Consolidated in early 1969, use of jet gas turbines constituted a design defect or a departure from good engineering principles.

■ The trial court removed from the jury's consideration the adequacy of the jet-gas turbines, finding as a matter of law that Worthington had not contractually guaranteed a 10,000-hour TBO and that Consolidated had specifically contracted for installation of jet-gas turbines rather than industrial-type turbines. Review of the record convinces us that the trial court correctly took the question from the jury. The only disputed fact questions on the guaranteed TBO issue were whether the Pratt & Whitney brochure had been included in the proposal book and whether Worthington had made verbal representations that the jet gas engines would have a 10,000-hour TBO. Even resolving these conflicts in Consolidated's favor, the trial court correctly concluded *as a matter of contract law* that nothing in the final written contract between the parties could be construed as a contractual obligation to provide engines with a guaranteed 10,000-hour TBO. Even if the brochure had been in the proposal book, which was admittedly incorporated in the contract, no reasonable business person would conclude that the parties intended that Worthington would be contractually bound by manufacturers' brochures containing general descriptions and performance averages of their products. The more reasonable interpretation is that Worthington contracted only to provide the products as described in the *technical specifications.* Not surprisingly, Consolidated is unable to cite any law in support of its proposition. Nor did it introduce any evidence at trial that a custom of the trade is to incorporate manufacturer's puffery in contract terms.[2]

■ As to Consolidated's contention that the very use of jet-gas turbines constituted a design defect, the record is simply devoid of any evidence that, at the time of making the contract, use of jet-gas engines constituted an unacceptable design or a violation of good engineering practice. The trial court thus correctly determined that no factual issue concerning the adequacy of the turbines was raised by the evidence and properly removed the question from the jury's consideration.

3. Heat rate bonus.—Consolidated next challenges the sufficiency of the evidence to support the jury's finding that Worthington had earned the heat rate bonus provided in the contract. According to the contract, Worthington could earn a bonus if the efficiency of the plant exceeded the guaranteed rate. The contract prescribed the test to measure the energy rate:

2. Any possible detrimental reliance or promissory estoppel argument is considerably undermined by testimony of Mr. William Boyer, Consolidated's top man in charge of the Lake Charles plant. In discussing why the maintenance contract was important to Consolidated, Boyer said:

Frankly, we were very much concerned about these jet engines. We had studied the industrial type engine prior to this with General Electric, and General Electric had made a policy decision that they could not bid turnkey, lump sum, which was a condition of the public bid laws of Louisiana. Worthington came to us with a proposal for jet engines to do this type of work and they represented that these jet engines would produce a minimum of ten thousand hours time between overhauls. In fact, in sales presentations to me they said you can expect fourteen thousand hours up to sixteen thousand hours, these things are reliable. *We didn't fully believe them and we insisted that this maintenance agreement, they would have to maintain those engines as part of being given the construction contract.*

Appendix, vol. 4, at 1132. (Emphasis added.)

Thus, Consolidated was not convinced or misled by Worthington's alleged representations and did not rely on them. Boyer's testimony also seems inconsistent with a belief that Worthington had contractually guaranteed 10,000 hours running time in the construction contract. Under such a contractual guarantee Worthington would have been liable for breach of contract and resulting damages if the engines failed to run the 10,000 hours, making the maintenance contract provision seem superfluous.

[T]he guarantee point for this plant will be the net plant heat rate at full load conditions (two steam and two gas turbines operating at a .85 power factor under ambient conditions of seventy degrees Fahrenheit and eighty-five per cent relative humidity.) . . . A heat rate test will be performed using station instruments as installed with the owner [Consolidated] furnishing the electrical load.

Appendix, vol. 4, at 1280.

When Worthington was ready to run the heat rate test, Consolidated was unable to furnish a full load to four turbines. Worthington thus informed Consolidated that the test would be conducted on half the plant at a time. Consolidated agreed to the test under those conditions, but reserved the right to have its expert review and challenge the test results. Worthington ran the test, which showed that Worthington had earned the maximum bonus. The results were reported to Consolidated, which raised no objection to them until shortly before trial.

At trial Consolidated challenged Worthington's right to the heat rate bonus on two grounds: (1) the test results inaccurately reflected the heat rate because instruments had not been properly calibrated and certain engineering standards had not been followed; and (2) the test had not been conducted in accordance with an absolute contract requirement that two steam turbines and two gas turbines be used simultaneously.

On the first objection—general accuracy of the test—the evidence was of course in complete conflict, but more than enough testimony supports the jury's resolution of the issue in Worthington's favor. Nor is Worthington's right to the bonus defeated by the second objection raised by Consolidated that the test was not conducted while simultaneously operating two steam and two gas turbines, as allegedly required by the contract. The court interpreted the contract and instructed the jury that the only absolute requirements as to the conduct of the heat rate test were to use station instruments and to get the load from Consolidated. On appeal, Consolidated has raised no proper objection to this interpretation of the contract by the court and the instruction to the jury.[3] Under the instructions given it, the jury had ample evidence from which to conclude that Worthington had earned the contract bonus.

4. Summary judgment on counterclaim.—Consolidated counterclaimed against Worthington for $4 million in damages allegedly caused by Worthington's failure to complete the power plant on the date specified in the contract. The contract contained liquidated damages provisions clearly defining and limiting Worthington's liability for delay damages;[4] and the court

---

3. Even if Consolidated had properly challenged on appeal the trial court's construction of the contract provision describing the heat rate test, we would agree with the court below that the contract does not require that four turbines be tested simultaneously. Defining the guarantee point as "the net plant heat rate at full load conditions (two steam and two gas turbines operating at a .85 factor under ambient conditions of seventy degrees Fahrenheit and eighty-five per cent relative humidity)" does not mean that all four generators must be run simultaneously, any more than it requires waiting until the temperature is exactly seventy degrees and the humidity eighty-five percent. The more logical reading is that the contract requires that the results of a test run under different conditions be converted to reflect a heat rate under the defined conditions.

Moreover, if the contract had required simultaneous operation of four turbines, the evidence clearly establishes that Consolidated waived the requirement and consented to testing half the plant at a time.

4. The contract provided:

II C. Contractor agrees to pay to Owner the sum of five hundred dollars ($500) per calendar day as fixed, predetermined liquidated damages for each calendar day that completion extends beyond the completion date of December 15, 1970 provided in A above except as provided in the immediate preceding paragraph B [providing extentions if Consolidated failed to clear the work site by a certain date] and following paragraphs 1, 2, and 3. In any event, the total sum payable as liquidated damages shall not exceed One Hundred Thousand Dollars ($100,000).

below granted partial summary judgment that any delay damages against Worthington were limited by the contract to $500 per day, not to exceed $100,000. Although Consolidated advances several creative arguments attacking this conclusion, we find them all insufficient to abrogate the unambiguous liability limitation in the contract and hold that the trial court properly granted summary judgment on the counterclaim.

5. Interest on judgment.—The court below awarded interest on Worthington's claims to run from the time when the payments first came due. Consolidated contends this was error, arguing that interest should run only from the date of judicial demand. Article 1938 of the Louisiana Civil Code provides, "All debts shall bear interest at the rate of seven per centum per annum *from the time they become due,* unless otherwise stipulated." (Emphasis added.)

Although the Louisiana courts have experienced difficulty in applying this rule in some situations, they have consistently held in cases analogous to the instant one that interest runs from the time the debt becomes due rather than from the date of judicial demand. *E. g., Messina v. Koch Industries, Inc.,* 267 So.2d 221 (La.App. 1972), *aff'd,* 283 So.2d 204 (La.Sup.) (interest on debt for construction work runs from last date labor and materials were furnished); *Hargrove, Guyton, Van Hook and Ramey v. Blanchard,* 216 So.2d 127 (La.App.

1968), *writ ref'd,* 253 La. 321, 217 So.2d 413 (attorneys who mailed statement to defendant were entitled to interest from date statement was mailed, not date of judicial demand).

The trial court properly followed Louisiana statutory law and its judicial interpretation in awarding interest to Worthington from the time its payments became due.

### Worthington's Appeal

Worthington's only challenge to the lower court's judgment is that the district court erred as a matter of law in permitting to stand the jury's determination that the cost of remedying certain alleged design deficiencies should be deducted from the balance of the contract price due Worthington.

Worthington relies on the Louisiana legal principle that an owner may be deemed to have abandoned or waived the right to complain of alleged defects or deficiencies in construction work—unless the defects were latent—if the owner fails to raise timely objection to those defects during construction.[5] Worthington points out that it furnished flow sheets and detail drawings to Consolidated throughout construction, which would have revealed the alleged defects Consolidated raised at trial. Consolidated, on the other hand, argued that it had no duty to review the drawings and raise objections and that Consolidated

1. In the event of work stoppages due to labor difficulties which are beyond the reasonable control of Contractor, a one (1) day extension to the December 15, 1970 completion date shall be granted for each day said condition or the result thereof exists.

2. A one (1) day extension to the December 15, 1970 completion date shall be granted for each day on which rainfall on the work site in the opinion of the Engineer prevents the Contractor from satisfactorily proceeding with the work.

3. Contractor shall not be liable for any loss, or delay for damage or non-delivery due to acts of civil or military authority, acts of Owner or by reason of "force majeure," which shall be deemed to mean all other causes whatsoever, except negligence, not reasonably within the control of Contractor including, but not limited to acts of God, war, riot or insurrection, blockades, embargoes, sabotage, epidemics, and fires.

Such liquidated damages are for defraying the cost of engineering services and are agreed upon not as a penalty, but as fixed and liquidated damages for each day of such delay, to be paid in full and subject to no deduction.

III. Owner hereby waives the right to any and all consequential damages beyond the amounts agreed to in IIC above.

5. *See, e. g., P. Olivier & Sons v. Board of Comm'rs of Lake Charles Harbor & Terminal District,* 177 La. 157, 148 So. 12 (1933); *A. M. Blodgett Const. Co. v. Cheney Lumber Co.,* 129 La. 1057, 57 So. 369 (1912); *AA Home Improvement Co. v. Shane,* 217 So.2d 445 (La. App.1969); *Justiss-Mears Oil Co. v. Pennington,* 132 So.2d 700 (La.App.1961).

personnel were not qualified to read the drawings and discover design defects.

The court instructed the jury on this question as follows:

> I instruct you that the flow charts and detailed drawings furnished by Worthington have, in effect, become a part of the contract between Worthington and Consolidated and that Consolidated did not have the right to complain after the construction work was completed, of any alleged design or engineering defects which a competent design engineer, electrical or mechanical, would have discovered from the drawings which were submitted.

Appendix, vol. 4, at 1375. These instructions, quite favorable to Worthington, adequately informed the jury that Consolidated could successfully complain after completion of the plant only of those defects which were "latent" during the period of construction, *i. e.,* defects which a competent design engineer could not have discovered from the drawings.

Worthington argues on appeal that Mr. Adelsflugel, Consolidated's project engineer and power plant manager, conceded that all but five of the claimed deficiencies would have been obvious to an engineer studying the design drawings (those five defects could have been remedied at a cost of only $49,000). An examination of the record, however, reveals that Mr. Adelsflugel conceded only that detail drawings had been received by Consolidated for all but five items. Whether or not the drawings received on the other items contained "obvious" or "latent" defects was in fact a hotly contested issue throughout trial. Again, the evidence was conflicting; yet ample testimony supports the jury's apparent conclusion that more than the conceded five items constituted "latent" design defects of which Consolidated could legitimately complain at trial. The trial court therefore committed no error in allowing to stand the jury's finding that Consolidated was enti-

tled to a $287,260 offset as the cost of remedying latent design deficiencies.

AFFIRMED.