Morris AYMOND,
Plaintiff-Appellee-Cross-Appellant,

v.

TEXACO, INC., et al.,
Defendants-Appellants-Cross-Appellees.

No. 75–2931.

United States Court of Appeals,
Fifth Circuit.

June 17, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 17, 1977.

Edmund E. Woodley, Lake Charles, La., for defendants-appellants.

Darrell J. Hartman, Kaplan, La., for plaintiff-appellee.

Harvey L. Strayhan, New Orleans, La., for Bethlehem.

James E. Diaz, Lafayette, La., for Seaboard & Highlands.

William M. Nolen, William B. Swift, Lake Charles, La., for Jones & Laughlin.

Before AINSWORTH and CLARK, Circuit Judges, and HUGHES *, District Judge.

HUGHES, District Judge:

While working on a drilling crew on a fixed platform off the Louisiana coast, Morris Aymond was injured when a steel cable, called a snub line, snapped, allowing metal tongs which it anchored to swing into and damage his knee.

Aymond, an employee of Falcon Seaboard Drilling Company, instituted a negligence action against Texaco, Inc., on whose platform he was working at the time of the accident, and Travelers Insurance Company, Texaco's insurer. Aymond also named Jones & Laughlin Steel Corporation as a defendant, alleging its liability as either a vendor or manufacturer of the broken cable. Texaco filed a third party complaint

against Falcon, with which it had a drilling contract at the time of the accident, and its insurer, Highlands Insurance Company. In this third party complaint, Texaco sought indemnity from Falcon or, alternatively, insured status under Falcon's insurance contract with Highlands. Falcon and Highlands then filed a third party complaint against Jones & Laughlin.

The trial court directed a verdict in favor of Jones & Laughlin and, after refusing to direct a verdict in favor of Texaco against Aymond, let the balance of the case go to the jury.[1] The jury found both Texaco and Falcon negligent, but the trial court released Falcon from liability after holding that Falcon owed no indemnity to Texaco because of Texaco's negligence. Thus, after this legal scramble, Texaco was left holding the bag.

Texaco has appealed, raising four principal issues. Aymond has cross-appealed on the issue of computation of interest.

We first address the issue of whether or not the trial court erred in its denial of Texaco's motions for directed verdict and judgment notwithstanding the verdict.

The cable which snapped was thrown into the Gulf of Mexico shortly after the accident and was unavailable for inspection at trial. Testimony indicated that it was a ⅞″ "wire rope" made of woven steel strands with a steel core, and that witnesses who inspected the cable before it was tossed overboard found it was rusty at the center but not on the outside. Basically, Aymond's negligence argument was that Texaco had breached its duty of reasonable care owed to Aymond in that it had required Falcon to use salt water instead of fresh water to wash as often as 50 times per day the deck around the drilling area. The broken cable had been looped around metal tongs which were used in drilling operations in this area and which allegedly were washed by this salt water. As part of

* Senior District Judge of the Northern District of Texas, sitting by designation.

1. The trial court also granted a motion for summary judgment in favor of Bethlehem Steel Corporation which had been brought into the action through pleadings of both Aymond and Falcon. Nothing relating to this matter is before us.

his negligence theory, Aymond contended that salt water: caused corrosion faster than fresh water; was indeed used to wash down the deck and some of the equipment, including the tongs and the part of the cable looped over the tongs; and caused corrosion which contributed significantly to the cable's breaking.

Before considering the evidentiary details, we note the following passage which sets forth the standard by which both trial and appellate courts must judge motions for directed verdict and judgment notwithstanding the verdict: "[T]he Court should consider all of the evidence . . . but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable . . . men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969). *See also Worthington Corp. v. Consolidated Aluminum Corp.,* 544 F.2d 227 (5th Cir. 1976). Did Aymond present "substantial evidence" that Texaco was negligent?

In disclaiming its negligence,[2] Texaco makes several arguments. It argues that the need to conserve fresh water offshore due to transportation difficulties and expense justified the use of salt water to wash work areas. It argues that evidence showed the universal practice in the offshore drilling industry was to use salt water for clearing decks and fresh water for washing equipment. It argues that evidence showed salt water did not cause the snub line's failure because the point of failure was washed with fresh water, the cable

was in use only 10 to 12 days, and the cable's being rusty on the inside but not the outside indicated that the cable had a defect prior to its use. Furthermore, Texaco argues, there was expert testimony that the cable could not have failed in such short time due to corrosion from salt water. Finally, Texaco claims that Aymond's principal expert witness, Frank Weaver, gave speculative testimony based only on a hypothetical situation and that his testimony indicated that washing with salt water was only one of several possible causes of the cable's corrosion.

Arrayed against Texaco's evidence, Aymond had testimonial evidence that, regardless of any presumed need to minimize the use of fresh water offshore, it was *not* the universal practice in the offshore drilling industry to wash the decks with salt water, that the point of failure *was* washed with salt water, and that spraying with salt water could have caused corrosion within so short a time as 10 to 12 days, with the cable's weakening from such corrosion being exacerbated by stress placed on the snub line. Aymond's expert witness Weaver testified that a metallurgical theory known as the "wick theory" would explain the phenomenon of a cable rusting on the inside before the outside. In what is perhaps the weakest part of Aymond's negligence case against Texaco, Weaver testified at length in response to a hypothetical question by Aymond's counsel. This portion of Aymond's case requires some elaboration.

In response to the hypothetical question, necessitated by the cable's unavailability, Weaver testified that the cause of cable failure would be corrosion from salt water. As brought out on cross-examination, the question excluded certain other possible causes of stress corrosion, an exclusion acknowledged by Weaver in a colloquy with the district judge:

"THE COURT: Now, what Mr. Woodley [Texaco's attorney] is asking is that [salt water as the cause of corrosion] just a

---

2. Under applicable Louisiana law, negligence is the breach of a duty to protect against an unreasonable risk of foreseeable harm. *See, e.*

*g., Traders and General Insurance Co. v. Robison,* 289 So.2d 178 (La.App.1973).

possible something or is that probable, in your opinion?

THE WITNESS: I have to say, Judge, based on the facts that I have been presented with, this would be probable, as much as possible. In the hypothet, we have eliminated the other possible.

.    .    .    .    .

THE WITNESS: I think you can appreciate that I elaborated that there are many possible causes." (R. 589–90).

Later, there was this exchange between the district judge and Weaver:

"THE COURT: But as far as you are concerned it [salt water and subsequent corrosion as the cause of the breakage] might have been possible and it might have been probable?

THE WITNESS: That's right.

THE COURT: You are not choosing between those words?

THE WITNESS: No, sir." (R. 598).

We discern in Mr. Weaver's testimony a scientist's punctilious adherence to faith in the need for direct observance of events and to the advisability of avoiding categorical statements. However, the legal system does not and should not require that evidence be weighed with scientific exactitude. Verbal, not mathematical, formulas are used to resolve evidentiary problems. Here, the verbal formula is supplied by *Boeing* and it is quite apparent that Mr. Weaver's testimony on the cause of breakage is of the type that could lead to different conclusions by different reasonable people on the accident's cause. Aymond also presented substantial evidence opposed to the motions on the other elements of its negligence claim against Texaco. Therefore, we find no error in the trial court's denial of Texaco's motions for directed verdict and judgment notwithstanding the verdict.

We next address the question of whether the district court properly held that Texaco was not entitled to indemnity from Falcon.

The drilling contract between Texaco and Falcon contained the following provision as ¶ 10(e):

Contractor [Falcon] agrees to protect, indemnify and save TEXACO harmless of and from all claims, demands and causes of action in favor of third parties on account of personal injuries or death or on account of property damage other than property damage expressly described in subparagraph 10(c) above which arises out of the work to be performed by Contractor or Contractor's agents and employes. Contractor also agrees to protect, indemnify and save TEXACO harmless of and from all claims, demands, and causes of action in favor of Contractor's employes on account of personal injuries or death on account of property damage, no matter how such claims arise.

Texaco claims that the last sentence of ¶ 10(e), especially the clause "no matter how such claims arise," "clearly and unequivocally" indicates that Falcon was to indemnify Texaco for negligence claims by Falcon's employees against Texaco, especially since Falcon was also found negligent.

■ Under Louisiana law, an aspiring indemnitee which is itself negligent has an especially heavy burden to bear in order to gain indemnification. *Cf. Stephens v. Chevron Oil Co.,* 517 F.2d 1123, 1125–26 (5th Cir. 1975). Several cases have enunciated the standard by which such indemnity clauses as ¶ 10(e) are to be judged. "[A] contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms." *Green v. Taca International Airlines,* 304 So.2d 357, 361 (La. 1974); *see also Lanasse v. Travelers Insurance Co.,* 450 F.2d 580 (5th Cir. 1971). Failure to expressly use the word "negligence" is "evidence of the . . . intention not to provide indemnification for the indemnitee's negligent acts. . . . [O]therwise the presumption is that the indemnification is applicable only to vicarious responsibility of the indemnitee resulting from negligent acts of the indemnitor." *Cole v. Chevron Chemical Co.—Oronite Division,* 477 F.2d 361, 368 (5th Cir.), *cert. denied,* 414 U.S.

858, 94 S.Ct. 67, 38 L.Ed.2d 109 (1973). Since the clause at issue here did not use "negligence", the presumption is that indemnity was not to flow to Texaco. Furthermore, Texaco seems capable of overcoming this presumption only if it can show no ambiguity in the phrase "no matter how such claims arise." Two factors indicate that ambiguity does reside in the clause and that, therefore, Texaco has failed to overcome the presumption.

First, and most important in our view, ¶ 10(d) is the clause immediately preceding the contested ¶ 10(e). ¶ 10(d) *specifically* used the word "negligence" in making Texaco indemnifiable by Falcon for equipment losses even if Texaco was the party responsible (by negligence) for such loss. Lack of such specificity in the immediately succeeding ¶ 10(e) suggests that Texaco did not intend for indemnity to flow for its own negligence. A second factor indicating ambiguity arises from reading the phrase "no matter how such claims arise" as covering only those situations in which a party other than Texaco or Falcon successfully holds Texaco vicariously liable for Falcon's negligent acts. Here, Texaco itself was found negligent. Finally, we point out that Falcon's negligence is immaterial to this indemnification issue. *See, e. g., Green* and *Cole, supra.*

■ The third issue raised by Texaco on appeal is whether or not the trial court properly found that Texaco was not an insured party under Falcon's liability policy with Highlands.

The insurance policy issued by Highlands covered "owners or co-owners of oil or gas leases for whom the insured [Falcon] acts under written contract as *operating agent* . . . ." (Emphasis added). Texaco argues that Falcon was its "operating agent", thereby making Texaco an insured party under the policy. At least, Texaco urges, the term "operating agent" is ambiguous and should be construed against the insurer, Highlands. Yet, the object and intent of the parties is primary in construing insurance, or other, contracts. *See, e. g., Muse v. Metropolitan Life Insurance Co.,* 193 La. 605, 192 So. 72 (1939). We must view the policy as a whole "to determine the intention of the parties from the terms of the policy as they would reasonably be understood . . . ." *Travelers Insurance Co. v. Highlands Insurance Co.,* 546 F.2d 1147, 1149 (5th Cir. 1977). The policy contains no definition of "operating agent", but testimony indicated that an entity acting as an "operating agent" in the oil and gas industry is endowed with more responsibility and authority than Falcon had under its contract with Texaco. In fact, an operating agent's authority even includes hiring drilling contractors such as Falcon. Neither of the actual parties to the insurance contract, Falcon and Highlands, disputes the meaning of "operating agent". Clearly, Falcon was a drilling contractor, not an operating agent. Therefore, Texaco was not an insured party under the liability policy.

The final issue raised by Texaco's appeal is the validity of the directed verdict for Jones & Laughlin.[3]

■ Any liability which Jones & Laughlin might have could be either as a seller or a manufacturer of the cable. We can quickly dispose of the issue of Jones & Laughlin's possible liability as a seller of the cable, without discussing all the arguments Jones & Laughlin presented on appeal. One of the essential elements for recovery against a vendor in a Louisiana products liability case is that the vendor knew or should have known of the defect. *Spillers v. Montgomery Ward & Co., Inc.,* 294 So.2d 803 (La.1974). The only alleged defect in the cable was hidden in its core and a vendor has no duty to inspect and discover such hidden defects when the product appears normal. *See Cain v. Rapides Dodge, Inc.,* 207 So.2d 918 (La.App.1968).

■ To establish Jones & Laughlin's liability as a manufacturer, it must be proved that: (1) Jones & Laughlin was the manufacturer; (2) the cable was defective; and

---

**3.** Neither Aymond nor Falcon appealed the directed verdict for Jones & Laughlin. Texaco's pleadings alleged no cause of action against Jones & Laughlin.

(3) the defect caused Aymond's injuries. Failure to introduce "substantial evidence" on any one of these elements makes a directed verdict for Jones & Laughlin proper. *See Boeing, supra.* In directing a verdict for Jones & Laughlin, the trial court primarily relied on the failure of proof that Jones & Laughlin was the cable's manufacturer. The cable could not be traced directly to the Jones & Laughlin Supply Division's local store in Morgan City, Louisiana, and no evidence was presented that that store was Falcon's sole supply source for the type of ⅛″ cable which failed.[4] The Morgan City store, itself only a part of a subsidiary of defendant Jones & Laughlin Steel Corporation, did sell ⅛″ cable to Falcon during a period before the accident. However, cable sold by the store was unmarked as to manufacturer, and the store's cables were manufactured by other entities in addition to Jones & Laughlin. The store's records indicated that all cables sold to Falcon in the period before the accident were from manufacturing sources other than Jones & Laughlin. Conjectures about the possibility that Jones & Laughlin manufactured the particular cable are supported by a logic that is linked only tenuously if at all, to evidence. An absence of "substantial evidence" on this one element of manufacturer's liability suffices to support a directed verdict. Additional support derives from the absence of evidence that the cable which broke was defectively manufactured.

Texaco relies on *Penn v. Inferno Manufacturing Corp.,* 199 So.2d 210 (La.App. 1967), *cited with approval in Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.,* 262 La. 80, 262 So.2d 377 (1972), to argue that Jones & Laughlin must be deemed the manufacturer of all cable sold at the Morgan City store. We need not decide whether acceptance of this argument would raise the weight of the evidence to the level of "substantial" since *Penn's* logic is not extendable to this case. *Penn* dealt with a product which the seller had marked as its own, though it had not

manufactured it, and which had been incorporated as a component of a larger product which *was* manufactured by the seller. Here, the cable was unmarked and was not a component of a product which was marked. Invoices accompanying sold cables were not markings, since their purpose, recognized by all, was to note a sale and identify the seller, not the manufacturer.

■ The trial court awarded Aymond interest from the date of judgment, pursuant to 28 U.S.C. § 1961 which provides in pertinent part: "[I]nterest shall be calculated from the date of the entry of the judgment . . . ." Aymond, on his cross-appeal, argues that interest should have been awarded from the date of judicial demand, pursuant to a Louisiana statute, LSA–R.S. 13:4203, which reads: "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, 'ex delicto', which may be rendered by any of the courts." *Berry v. Sladco, Inc.,* 495 F.2d 523 (5th Cir. 1974), held that the federal, not state, statute governs the award of interest in suits brought under the Outer Continental Shelf Lands Act [Lands Act], 43 U.S.C. § 1331 *et seq.* Aymond attempts to distinguish *Berry* on the ground that his action was brought under the diversity of citizenship jurisdictional statute, 28 U.S.C. § 1332, rather than the Lands Act. This distinction fails. The accident occurred on a fixed platform on waters above the outer Continental Shelf. The Lands Act extended federal jurisdiction to the outer Continental Shelf, including fixed structures erected thereon, "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ." 43 U.S.C. § 1333(a)(1). *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), said: "The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer Continental Shelf. That this law was to be federal law of the United States, applying state law

---

**4.** A Falcon employee, E. C. Stevens, did testify that he bought all his cable from the Morgan City store, but he was not the sole purchaser of supplies for Falcon.

only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the Act." 395 U.S. at 355–56, 89 S.Ct. at 1837. Later, it is said that "federal law is 'exclusive' in its regulation of this area, and that state law is adopted only as surrogate federal law." 395 U.S. at 357, 89 S.Ct. at 1838. *Rodrigue* makes it clear that Louisiana law is applicable through, not independent of, the Lands Act. Thus, this action was in federal court under the Lands Act, not the diversity statute, in a manner indistinguishable from the *Berry* action, and, as in *Berry,* there are no gaps in the federal law on computation of interest to be filled by the Louisiana interest statute.

In all respects, the decision of the trial court is AFFIRMED.

CLARK, Circuit Judge, concurring in part and dissenting in part:

While I concur in the affirmance of the directed verdict in favor of Jones & Laughlin Corporation, I respectfully dissent from the affirmance of the trial court's refusal of the same relief to Texaco.

Of course the majority is correct in reciting that *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969), is the benchmark that determines whether Aymond made a case sufficient to go to the jury. Moreover, I have no quarrel with the majority's recitation of Aymond's evidence against Texaco concerning its negligence. Yet even assuming that Texaco owed a duty to Aymond not to order the cable washed with salt water and that this duty was breached, Aymond has not established by a preponderance of the evidence that *it was more probable than not, Townsend v. State,* La., 322 So.2d 139, 141 (1975), that Texaco's breach was the substantially contributing factor in causing Aymond's injuries. *Lombard v. Sewage & Water Board of New Orleans,* La., 284 So.2d 905, 913 (1973); *Laird v. Travelers Insurance Co.,* 263 La. 199, 267 So.2d 714, 717–18 (1972); *see Stewart v. Zurich Insurance Co.,* La.App., 342 So.2d 1273 (1977).

The sole testimony as to causation was by the expert witness, Weaver. The portion of Weaver's testimony that the majority quotes is at most an admission by Weaver that it "would be probable, as much as possible" that salt water caused the corrosion of the cable. A further excerpt from the colloquy between Texaco's counsel and Weaver is even more revealing:

Q. Isn't it a fact, Mr. Weaver, that there are a lot of variable factors in this case over which you have no particular knowledge? For example, you have already mentioned the absence of the cable, your inability to examine it, the exact frequency to which this cable was exposed to water, the type of water and so forth. Now, Mr. Weaver, would it be fair to state that you *cannot state with any reasonable degree of engineering or any other type of certainty as to what the particular cause of the failure was in this accident?*

A. I think that is a reasonable statement.

Before *Boeing* can be applied, there must be some testimony that Texaco's order to wash the steel cable with salt water was a substantially contributing cause to Aymond's injury. However, the only evidence on this point (Weaver's opinion evidence) adds up to nothing more than expert conjecture that it is *probable* that it was. On this record I would hold that Aymond put on no evidence to support the conclusion that it was more probable than not that washing the steel cable with salt water had a bearing on its breaking. Therefore, I am of the opinion that Texaco was entitled to a directed verdict and would reverse on this ground. I respectfully dissent.